PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  12-3798
_____

UNITED STATES OF AMERICA

v.

ANTHONY DOUGLAS ELONIS,
                                        Appellant
_____

On Appeal from the District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 5-11-cr-00013-001
District Judge: Honorable Lawrence F. Stengel

On Remand from the Supreme Court of the United States
on June 1, 2015

Argued after Remand on May 2, 2016

Before:  MCKEE[*], <u>Chief Judge</u>, HARDIMAN, and
SCIRICA, <u>Circuit Judges</u>

(Filed: October 28, 2016)

Ronald H. Levine, Esq.
Abraham J. Rein, Esq. [ARGUED]
Post & Schell
1600 John F. Kennedy Boulevard
Four Penn Center, 13th Floor
Philadelphia, PA  19103
        *Counsel for Appellant*

Michael L. Levy, Esq.  [ARGUED]
Robert A. Zauzmer, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106

Sherri A. Stephan, Esq.
Office of United States Attorney
504 West Hamilton Street
Suite 3701
Allentown, PA  18101
        *Counsel for Appellee*

---

[*] Judge McKee was Chief Judge at the time this appeal was argued. Judge McKee completed his term as Chief Judge on September 30, 2016. Judge D. Brooks Smith, assumed Chief Judge status on October 1, 2016.

2

---

OPINION OF THE COURT

---

**SCIRICA**, *Circuit Judge*

Anthony Elonis was convicted of violating 18 U.S.C. § 875(c), which prohibits transmitting in interstate commerce a communication containing a threat to injure the person of another. We affirmed his conviction on appeal, but the Supreme Court reversed our judgment. It held that the jury instruction regarding Elonis's mental state was insufficient and therefore erroneous. On remand, we will once again affirm Elonis's conviction because we hold the error was harmless.

## I.

In May 2010, Elonis's wife left him, moved out of their home, and took their two children with her. Shortly thereafter Elonis began having problems at work. He was an operations supervisor and communications technician at Dorney Park & Wildwater Kingdom amusement park. His supervisors observed him with his head down on his desk crying, and he was sent home on several occasions because he was too upset to work.

One of the employees Elonis supervised, Amber Morrissey, made five sexual harassment reports against him. According to Morrissey, on one occasion Elonis came into her office late at night and began to undress in front of her.

She left after he removed his shirt. Morrissey also reported another incident in which Elonis made an employee who was a minor female uncomfortable when he placed himself close to her and told her to stick out her tongue.

Elonis's problems came to a head on October 17, 2010, when he posted a photograph from a Halloween event at the park to his Facebook page, showing him holding a knife to Morrissey's neck. He added the caption "I wish" under the photo. When his supervisor saw the Facebook post, Elonis was fired.

Two days later, on October 19, Elonis posted another violent statement to his Facebook page. He wrote:

> Someone once told me that I was a firecracker. Nah. I'm a nuclear bomb and Dorney Park just f***ed with the timer. If I was the general manager, I'd be on the phone with Sandusky[1] discussing a damage control plan. But I'm not and y'all haven't heard the last of Anthony Elonis.

This post raised concern among Elonis's coworkers, who followed him on Facebook. They voiced their concern in Facebook posts of their own. One post stated, "I hope that Dan Hall [chief of patrol at Dorney Park] is aware that security needs to be looking out for him . . . ," and another expressed fear that Elonis would "hurt or kill" someone.

---

[1] Sandusky, Ohio is the location of Dorney Park's corporate headquarters.

Elonis was aware of these fears. He admitted at trial that he had saved screenshots of the posts on his computer.

The fear among Dorney Park employees was not limited to these Facebook posts. Hall, the chief of patrol, testified at trial that he took steps to enhance park security and informed local police and the FBI of Elonis's statements. Morrissey testified that she had chosen a hiding place in case Elonis ever came back to Dorney Park.

Despite his knowledge that his violent post had scared coworkers, Elonis posted another violent message two days after viewing his coworkers' exchanges. He wrote:

> Moles. Didn't I tell ya'll I had several? Ya'll saying I had access to keys for the f***ing gates, that I have sinister plans for all my friends and must have taken home a couple. Ya'll think it's too dark and foggy to secure your facility from a man as mad as me. You see, even without a paycheck I'm still the main attraction. Whoever thought the Halloween haunt could be so f***ing scary?

This post became the basis for Count One of Elonis's indictment, threatening park patrons and employees. He was acquitted of the charges in this count.

Around the same time, Elonis began posting crude, degrading, and violent material to his Facebook page about his (soon-to-be former) wife. One post states, "If I only knew then what I know now, I would have smothered your ass with a pillow, dumped your body in the back seat, dropped you off

5

in Toad Creek,[2] and made it look like a rape and murder." Another post was in response to a status update posted to Facebook by Elonis's sister-in-law. Her status update read, "Halloween costume shopping with my niece and nephew should be interesting." Elonis commented on this status, writing, "Tell [their son] he should dress up as matricide for Halloween. I don't know what his costume would entail though. Maybe [his mother's] head on a stick?" Elonis also posted in October 2010:

> There's one way to love you but a thousand ways to kill you. I'm not going to rest until your body is a mess, soaked in blood and dying from all the little cuts. Hurry up and die, b****, so I can bust this nut all over your corpse from atop your shallow grave. I used to be a nice guy but then you became a slut. Guess it's not your fault you liked your daddy raped you. So hurry up and die, b****, so I can forgive you.

At trial, Elonis's wife testified that her husband's posts "made [her] extremely afraid for [her] life." The posts made her feel "like [she] was being stalked," and made her feel "extremely afraid for [her] and [her] children's and [her] families' lives." She sought a Protection From Abuse order—essentially, a restraining order—against Elonis in state court. Elonis attended the proceeding at which the court issued the restraining order on November 4, 2010.

---

[2] Toad Creek runs behind Elonis's father-in-law's house, where Elonis's wife was living at the time of the post.

6

The issuance of the restraining order did not stop Elonis's violent rhetoric. On November 7, 2010, he posted an adaptation of a stand-up comedy routine to his Facebook. In the actual routine, a comedian explains that it is illegal for a person to say he wishes to kill the President, but not illegal to explain that it is illegal for him to say that. Elonis's version substituted his wife for the President:

> Hi, I'm Tone Elonis.
> Did you know that it's illegal for me to say I want to kill my wife? . . .
> It's one of the only sentences that I'm not allowed to say. . . .
> Now it was okay for me to say it right then because I was just telling you that it's illegal for me to say I want to kill my wife. . . .
> Um, but what's interesting is that it's very illegal to say I really, really think someone out there should kill my wife. . . .
> But not illegal to say with a mortar launcher.
> Because that's its own sentence. . . .
> I also found out that it's incredibly illegal, extremely illegal to go on Facebook and say something like the best place to fire a mortar launcher at her house would be from the cornfield behind it because of easy access to a getaway road and you'd have a clear line of sight through the sun   room. . . .
> Yet even more illegal to show an illustrated diagram.
> [diagram of the house]. . . .

The diagram of the home was accurate. At the end of the post, Elonis linked to a YouTube video of the original stand-

up routine, writing, "Art is about pushing limits. I'm willing to go to jail for my Constitutional rights. Are you?"

This was not the last violent remark Elonis made about his wife on his Facebook page. On November 15, referencing the Protection From Abuse order, Elonis wrote:

> Fold up your PFA and put it in your pocket
> Is it thick enough to stop a bullet?
> Try to enforce an Order
> That was improperly granted in the first place
> Me thinks the judge needs an education on true threat jurisprudence
> And prison time will add zeros to my settlement
> Which you won't see a lick
> Because you suck dog d*** in front of the children . . .
> And if worse comes to worse
> I've got enough explosives to take care of the state police and Sheriff's Department.

These posts formed the basis of Count Two of Elonis's indictment, threatening his wife. The reference to the police at the bottom of the November 15 post formed the basis of Count Three of his indictment, threatening law enforcement officers.

The next day, November 16, Elonis escalated his violent rhetoric to include elementary schools:

> That's it, I've had about enough
> I'm checking out and making a name for myself

8

> Enough elementary schools in a ten mile radius
> to initiate the most heinous school shooting
> ever imagined
> And hell hath no fury like a crazy man in a
> kindergarten class
> The only question is . . . which one?

This post formed the basis of Count Four of Elonis's indictment.

By this point, the FBI was monitoring Elonis's Facebook posts, because Dorney Park had contacted the FBI regarding Elonis's violent rhetoric against Dorney Park and its employees. The threat to initiate a school shooting prompted the FBI to visit Elonis at his house on November 30. Elonis did not cooperate with the agents who attempted to interview him. Later that day, he posted:

> You know your s***'s ridiculous when you
> have the FBI knockin' at yo' door
> Little Agent Lady stood so close
> Took all the strength I had not to turn the b***
> ghost
> Pull my knife, flick my wrist, and slit her
> throat
> Leave her bleedin' from her jugular in the arms
> of her partner
> [laughter]
> So the next time you knock, you best be
> serving a warrant
> And bring yo' SWAT and an explosives expert
> while you're at it

Cause little did y'all know, I was strapped wit'
a bomb
Why do you think it took me so long to get
dressed with no shoes on?
I was jus' waitin' for ya'll to handcuff me and
pat me down
Touch the detonator on my pocket and we're
all goin'
[BOOM!]
Are all the pieces comin' together?
S***, I'm a crazy sociopath
that gets off playin' you stupid f***s like a
fiddle
And if y'all didn't hear, I'm gonna be famous
Cause I'm just an aspiring rapper who likes the
attention
who happens to be under investigation for
terrorism
cause y'all think I'm ready to turn the Valley
into Fallujah
But I ain't gonna tell you which bridge is
gonna fall into which river or road
And if you really believe this s***
I'll have some bridge rubble to see you
tomorrow
[BOOM!][BOOM!][BOOM!]

This post formed the basis of Count Five of Elonis's
indictment.

## II.

10

Elonis was arrested on December 8, 2010, and charged with transmitting in interstate commerce communications containing a threat to injure the person of another in violation of 18 U.S.C. § 875(c). Following his indictment, he moved to dismiss all five counts, contending his speech was protected by the First Amendment. The District Court denied his motion and his case proceeded to trial.

Elonis testified in his own defense at trial. He claimed he did not intend to make any threats, and would never act violently. He testified, "These were—these were lyrics. These—these were for entertainment purposes only. They weren't intended for anyone to feel like I was threatening them or feel scared. I didn't want anyone to feel scared." When asked how he thought people might interpret his posts, Elonis responded, "You know, I didn't really care what other people thought." He further testified, "I made an on-line persona and I figured the worse I made myself seem, you know, I didn't care what people said about me."

Applying circuit precedent, the District Court instructed the jury that

> a statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual.

The government's closing argument emphasized that it was irrelevant whether Elonis intended the postings to be threats, saying:

> Even if you were to believe absolutely everything that he said to you today, it has absolutely no[] impact on whether or not you should find him guilty or not. . . . Again, it doesn't matter what he thinks.

The jury convicted Elonis on Counts Two through Five of his indictment, acquitting him only of Count One, threatening park patrons and employees. He was sentenced to forty-four months' imprisonment.

On appeal, Elonis argued that the Supreme Court's decision in *Virginia v. Black*, 538 U.S. 343 (2003), requires a jury to find that a defendant subjectively intended his statements to be understood as threats for them to fall under the true-threat exception to the First Amendment. Applying circuit precedent, we upheld his conviction.[3]

---

[3] Except for the Court of Appeals for the Ninth Circuit, *see United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011); *United States v. Cassel*, 408 F.3d 622, 631–32 (9th Cir. 2005), our opinion conformed to the general agreement at the time among other sister circuits that an objectively threatening communication falls into the true-threat exception to the First Amendment, *see, e.g.*, *United States v. White*, 670 F.3d 498, 510 (4th Cir. 2012) (collecting cases), *abrogated by Elonis v. United States*, 135 S. Ct. 2001 (2015). None have had a chance to reconsider in light of the Supreme Court's opinion in this case.

The Supreme Court granted certiorari and reversed. *Elonis v. United States*, 135 S. Ct. 2001 (2015). The Court did not reach the First Amendment issues presented by the case. Instead, it based its ruling on its interpretation of the statute under which Elonis was convicted, Section 875(c). Reasoning that "[f]ederal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state," the Court rejected the objective standard under which the jury was instructed. *Id.* at 2012. While the Court added that in this case, there was no dispute that a knowledge or purpose standard would satisfy Section 875(c)'s mental state requirement, it declined to address whether a recklessness standard would be sufficient. *Id.* Accordingly, it reversed our judgment and remanded the case for further proceedings consistent with its opinion.

Justice Alito concurred in part and dissented in part from the majority's opinion. He would have decided the recklessness issue and held that a recklessness standard satisfies Section 875(c)'s mental state requirement. *Id.* at 2016 (Alito, J., concurring). He also suggested that on remand we "consider whether [Elonis's] conviction can be upheld on harmless-error grounds." *Id.* at 2018 (Alito, J., concurring).

## III.

### A.

The jury at Elonis's trial was instructed it could convict him under Section 875(c) if it found that "a reasonable person in [his] position" would have "foreseen

13

that the communication he made would have been interpreted by the recipient as a serious expression of an intention to inflict bodily injury or take the life of an individual." The Supreme Court held this instruction was insufficient and therefore erroneous, because "negligence is not sufficient to support a conviction under Section 875(c)." *Elonis*, 135 S. Ct. at 2013. Instead, the Court explained, the jury should have been instructed it could convict Elonis if it found he "transmit[ted] a communication for the purpose of issuing a threat, or with knowledge that the communication w[ould] be viewed as a threat." *Id.* at 2012. The Court left open the question of whether an instruction on a standard of recklessness would be sufficient under Section 875(c) or under the First Amendment.

We believe Section 875(c) contains both a subjective and objective component, and the Government must satisfy both in order to convict a defendant under the statute. The Supreme Court focused on the subjective component. It held that to satisfy the subjective component of Section 875(c), the Government must demonstrate beyond a reasonable doubt that the defendant transmitted a communication for the purpose of issuing a threat or with knowledge that the communication would be viewed as a threat.[4]

The Government must also satisfy the objective component, which requires it to prove beyond a reasonable doubt that the defendant transmitted a communication that a

---

[4] As noted, the Court did not address whether a finding of recklessness would be sufficient.

14

reasonable person would view as a threat.[5] The objective component of Section 875(c) shields individuals from culpability for communications that are not threatening to a reasonable person, distinguishing true threats from hyperbole, satire, or humor. *See Watts v. United States*, 394 U.S. 705, 708 (1969). It requires the jury to consider the context and circumstances in which a communication was made to determine whether a reasonable person would consider the communication to be a serious expression of an intent to inflict bodily injury on an individual. *See Virginia v. Black*, 538 U.S. 343, 360 (2003).[6]

While it is clear that a defendant can be convicted under Section 875(c) for transmitting an objectively threatening communication "with knowledge that the communication will be viewed as a threat," Elonis and the Government disagree on the application of that standard. Elonis contends the Government must show the defendant "acted with knowledge of *a reasonable person's*

---

[5] The District Court's instruction in this case properly states the objective component.

[6] We recognize that, in addition to this objective component, the Ninth Circuit requires proof of a specific intent to threaten to satisfy the First Amendment. *See Bagdasarian*, 652 F.3d at 1118. *But see United States v. Jeffries*, 692 F.3d 473, 485 (6th Cir. 2012) (Sutton, J., dubitante) (explaining that as a matter of statutory interpretation, Section 875(c) requires a subjective component, but "as a matter of constitutional avoidance . . . threat prohibitions like [Section 875(c)] cover only 'real' threats, threats in other words that a reasonable observer would take as true and real"), *abrogated by Elonis*, 135 S. Ct. 2001 (2015).

15

interpretation of the speech as threatening," reasoning that "knowledge that particular persons would consider the communications threatening is not necessarily equivalent to knowledge of how a reasonable person would understand them." Were this not the standard, Elonis argues, a defendant could violate Section 875(c) merely by "post[ing] photos of his pit bull on Facebook . . . knowing that some members of the Facebook community unreasonably found photos of such dogs threatening . . . ."

Elonis's concerns are unfounded. The objective component of Section 875(c) ensures that a defendant can only be convicted for transmitting communications that are objectively threatening. Moreover, his approach would render the objective component meaningless. Instead of asking the jury whether the defendant's communication was objectively threatening, Elonis would ask only whether the defendant believed his communication was objectively threatening. But it is not for the defendant to determine whether a communication is objectively threatening—that is the jury's role. If a defendant transmits a communication for the purpose of issuing a threat or with knowledge that the recipient[7] will view it as a threat, and a jury determines that

---

[7] We recognize it may sometimes be difficult to pinpoint the recipient of the communication. This is especially so in the age of social media, when the recipient of the communication may be a defendant's Facebook followers or even the general public. But Section 875(c) operates the same whether the communication has one recipient or many. For example, if a defendant transmits a communication on Facebook, he violates Section 875(c) if the communication is objectively threatening and the defendant transmitted it for the purpose of

16

communication is objectively threatening, then the defendant has violated Section 875(c) whether or not he agrees the communication was objectively threatening.

With this understanding of Section 875(c) in mind, we will turn to Elonis's trial to determine whether the error at his trial was harmless.

**B.**

For a trial error to be harmless, we must "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Neder v. United States*, 527 U.S. 1, 19 (1999). Our inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). When the error involves a *mens rea* instruction, "[a] verdict may still stand, despite erroneous jury instructions, where the predicate facts 'conclusively establish [*mens rea*], so that no rational jury could find that the defendant committed the relevant criminal act'" without also finding the requisite *mens rea*. *Whitney v. Horn*, 280 F.3d 240, 260 (3d Cir. 2002) (quoting *Rose v. Clark*, 478 U.S. 570, 580–81 (1986)).[8]

---

issuing a threat or with knowledge that it would be viewed as a threat by his Facebook followers.

[8] In *Whitney*, the jury was improperly instructed regarding the element of intent in a first-degree murder case. We found that, due to the strong circumstantial evidence of intent within the record, no "reasonable jury could have had any doubt

Elonis was convicted on four counts of violating 18 U.S.C. § 875(c), which prohibits "transmit[ting] in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another . . . ." The jury was erroneously instructed under an objective standard. The parties dispute whether a recklessness standard or a knowledge standard is sufficient. But under either standard, we find the District Court's error was harmless. The record contains overwhelming evidence demonstrating beyond a reasonable doubt that Elonis knew the threatening nature of his communications, and therefore would have been convicted absent the error.

### 1.

Count Two of the indictment charged Elonis with violating Section 875(c) by communicating a threat to injure his ex-wife. The jury convicted Elonis on this count under an objective standard, finding that the Facebook posts about his ex-wife would be regarded as threatening by a reasonable person. A review of the evidence surrounding these posts unequivocally demonstrates the jury would have convicted Elonis were it required to find that he either knew his ex-wife would feel threatened by the posts or that he purposely threatened her.

In October 2010, just five months after Elonis's wife left him, Elonis posted three messages to Facebook that referenced, among other things, his desire to rape her, kill her,

about whether Whitney . . . form[ed] the intent to kill." 280 F.3d at 261.

18

put her head on a stick, and "bust this nut all over [her] corpse." Following these posts, Elonis's wife sought a restraining order against him. Elonis attended the proceeding at which the order was issued, on November 4, 2010. Despite knowing his wife felt threatened enough to seek a restraining order against him, Elonis continued his violent rhetoric with his November 7 post expressing, once again, his desire to kill his ex-wife. Just eight days later, he again posted a violent message about his ex-wife that explicitly referenced the restraining order she had obtained and asked whether it was thick enough to stop a bullet.

Elonis contends the jury may have acquitted him had it not been instructed on an incorrect objective standard. According to Elonis, these errors "rendered irrelevant" his testimony regarding his mental state at the time he posted the messages to Facebook. But as Elonis concedes, Section 875(c)'s mental state requirement can be met with proof of purpose or knowledge. His testimony at trial focused on his purpose of his Facebook posts, but never contested that he knew his posts would be viewed as threats.[9] Thus, even if the jury believed Elonis's testimony, it could still have found that he knew the threatening nature of his posts.

Moreover, even if Elonis had testified he did not know his ex-wife would feel threatened, "harmless-error cases do not turn on whether the defendant conceded the factual issue

---

[9] For example, Elonis testified his posts "weren't intended for anyone to feel like I was threatening them or feel scared." He further testified, "I'm not trying to threaten anyone." These statements offer his explanation for the purpose of his posts, but do not address whether he knew his ex-wife would feel threatened by them.

on which the error bore." *Rose*, 478 U.S. at 583. "[T]he fact that [Elonis] denied that he had [the requisite *mens rea*] does not dispose of the harmless-error question." *Id.* at 583–84. Instead, harmless error review "mandates consideration of the entire record" to determine whether the error was harmless beyond a reasonable doubt. *Id* at 583.

Reviewing the whole record, we find that even if Elonis had contested the knowledge element in his testimony, no rational juror would have believed him. Considering the graphic nature of the three messages Elonis posted in October, it is not at all credible that Elonis did not know his ex-wife would interpret them as threats. But it is less credible still that, having attended the court proceeding at which she sought a restraining order against him, Elonis remained unaware of his ex-wife's fears as he posted more violent messages on November 7 and 15. The evidence overwhelmingly shows that Elonis posted those two messages with either the purpose of threatening his ex-wife, or with knowledge that she would interpret the posts as threats. No rational juror could conclude otherwise.

**2.**

Count Three of the indictment charged Elonis with violating Section 875(c) by communicating a threat to injure employees of the Pennsylvania State Police and Berks County Sheriff's Department. Just as with Count Two, the jury convicted Elonis of this Count under an objective standard, finding that the Facebook post about the police would be regarded as threatening by a reasonable person.

20

Elonis's post regarding the police came at the end of his November 15 post about his ex-wife. It stated, "And if worse comes to worse / I've got enough explosives to take care of the state police and Sheriff's Department." Elonis advances several arguments for why the jury would not have convicted him had it been instructed under a knowledge standard.

First, he contends again that the objective standard prevented the jury from considering his testimony that he did not know his posts would be regarded as threatening. This argument fails for the same reasons as above. Contrary to his suggestion, Elonis never testified that he was unaware of the threatening nature of his posts referencing the State Police and the Sheriff's Department. Elonis knew that both his coworkers and his ex-wife felt threatened by the violent rhetoric in his previous Facebook posts. Despite that, he posted yet another violent message stating his intention to detonate explosives near State Police officers and the Sheriff's Department if "worse comes to worse." If anything, this post is a more explicit threat than those that he knew had frightened his coworkers and ex-wife. It is difficult to imagine how Elonis could have believed it would be interpreted as anything but a threat.

Second, Elonis contends the fact that his statements were in lyric form suggests he did not know they would be regarded as threats. The evidence suggests otherwise. This was not the first time Elonis used a lyric form to post threatening statements. He previously posted statements about Dorney Park on October 19 and 22 with a lyric form similar to his post about the police. But despite the use of a lyric form, several of Elonis's coworkers at Dorney Park

21

regarded the posts as threatening, and Elonis was aware of their fears. He knew that his use of a lyric form did not lessen the threatening nature of his posts. His continued use of the form only heightens the likelihood he knew a reasonable person would interpret his post as a threat.

Third, Elonis contends the fact he communicated his statements on Facebook— which he claims is "a medium that magnifies the potential for disconnect between the speaker's intent and the audience's understanding"—suggests he did not know his statements would be regarded as threats. But whatever disconnect there may have been surely disappeared when Elonis read his coworkers' posts about how they felt threatened, and when he discovered his ex-wife was seeking a restraining order against him. By the time he made his statement regarding the police, he was clearly aware of how his audience would understand it. His Facebook post was written either with the purpose to threaten the police, or with knowledge that the post would be interpreted as a threat.

**3.**

Count Four of the indictment charged Elonis with violating Section 875(c) by communicating a threat to injure a kindergarten class of elementary school children. The Facebook post that formed the basis for this charge states:

> That's it, I've had about enough
> I'm checking out and making a name for myself
> Enough elementary schools in a ten mile radius
> to initiate the most heinous school shooting ever imagined

> And hell hath no fury like a crazy man in a
> kindergarten class
> The only question is . . . which one?

As with the other counts, Elonis contends the jury may not have convicted him of this count were it required to find he knew the post would be threatening to a reasonable person. We disagree.

Elonis's post is graphic and specific in ways that make it impossible to believe he was unaware it would be interpreted as a threat. He specifically threatens elementary schools in a ten-mile radius, narrows his threat further to kindergarten classes within those elementary schools, and ends his post with a haunting question that suggests he will carry out his threat imminently. Given the understandable sensitivity regarding school shootings in this country, of which Elonis was no doubt aware, no rational juror could conclude that Elonis did not have the purpose to threaten, or did not know that a reasonable person would feel threatened, when he said he would "initiate the most heinous school shooting ever imagined."

**4.**

Finally, Count Five of the indictment charged Elonis with violating Section 875(c) by communicating a threat to injure an FBI agent. As with the other counts, the jury convicted Elonis under an objective standard, finding that the Facebook post about the FBI agent would be regarded as threatening by a reasonable person.

The post forming the basis for Count Five stated, referring to the FBI agent that visited Elonis's house earlier in the day, "Little Agent Lady stood so close / Took all the strength I had not to turn the b**** ghost / Pull my knife, flick my wrist, and slit her throat / Leave her bleedin' from her jugular in the arms of her partner." The post further stated that if the FBI returned, he would detonate an explosive device he had strapped to his body.

Elonis once more contends the jury may not have convicted him of threatening the FBI agent had it not been erroneously instructed under an objective standard. Once again, we disagree. By the time the FBI visited Elonis on November 30, he knew his former coworkers felt threatened by his posts. The chief of patrol at Dorney Park, a friend of Elonis's on Facebook, felt so threatened that he enhanced park security, informed the local police, and notified the FBI. Elonis knew his ex-wife felt threatened enough by his posts to take out a restraining order against him. And when FBI agents showed up at his door, Elonis knew his followers on Facebook felt threatened enough to contact the FBI, and the FBI took those concerns seriously. Despite that knowledge, Elonis posted yet another violent message, this time about one of the FBI agents that visited him. The evidence

overwhelmingly demonstrates Elonis knew how this post would be interpreted. No rational juror could have found Elonis did not have the purpose of threatening FBI agents or did not know his post about FBI agents would be regarded as a threat.

## C.

Our disposition on the issue of harmless error decides this case. Accordingly, we have no occasion to determine whether a finding of recklessness would be sufficient to satisfy the mental state requirement of Section 875(c). We will leave that question for another day.

## IV.

Based on our review of the record, we conclude beyond a reasonable doubt that Elonis would have been convicted if the jury had been properly instructed. We therefore hold that the error was harmless, and uphold his conviction.