**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

No. 18-3036

—————————

UNITED STATES OF AMERICA

v.

CHAD MICHAEL STONER,
Appellant

—————————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-16-cr-00357-001)
District Judge: Hon. Yvette Kane

—————————

Submitted Under Third Circuit L.A.R. 34.1(a)
July 8, 2019

—————————

Before: SHWARTZ, KRAUSE, and FUENTES, Circuit Judges.

(Filed: July 18, 2019)

—————————

OPINION*

—————————

SHWARTZ, Circuit Judge.

—————————

  * This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

Chad Stoner was convicted of conspiring to make and making threatening communications as well as mailing threatening communications. He appeals his convictions and the application of three sentencing enhancements. Because there was sufficient evidence to convict Stoner on all counts and because the District Court properly applied the sentencing enhancements, we will affirm.

I

A

Stoner was charged in a superseding indictment with conspiracy to transmit a threat in interstate commerce, 18 U.S.C. § 371; transmission of a threat in interstate commerce, 18 U.S.C. § 875(c); mailing threatening communications, 18 U.S.C. § 876(c); and various firearm offenses. Stoner pled guilty to one count of unlawful possession of a firearm by a convicted felon, 18 U.S.C. § 922(g), and the Government dismissed the remaining firearms counts. Stoner went to trial on four threat-related counts.

B

At trial, the jury heard testimony from township supervisor Loretta Wilhide, Officer Zachary Grey, township manager Lou Anne Bostic, Detective Mark Baker, FBI Special Agent Gary Leone, and Trooper Hugh Earhart. The Government also presented copies of letters Stoner sent to his girlfriend and co-conspirator Emily Winand from prison, recordings of phone calls between the two from prison, and two recordings of interactions between Stoner and township officials.

Wilhide testified that Stoner, a resident of Conewago Township, frequently attended township meetings. One evening, he caused a disturbance, prompting Wilhide

2

to call the police. Officer Grey arrested Stoner and charged him with disorderly conduct and disruption of a public meeting.

The following day, Stoner and Winand went to the township building to speak to Bostic. Stoner was wearing a "long machete type knife and a holster" strapped to his leg. JA 102. Stoner demanded a written statement concerning whether township meetings were recorded and the addition of an item to a future meeting agenda addressing the "official corruption" between the police department and Wilhide and the "clear and present prejudicial attacks that she is taking upon [Stoner]." Recording at Township Building, Aug. 4, 2016, at 2:58-3:44. Stoner told Bostic that if Wilhide "continues to act in the way that she is, I think Houston, Texas, is going to turn into Conewago Township,"[1] Recording at Township Building at 4:00-4:08, explaining to her that he was referring to "where they shot all them cops," Recording at Township Building at 4:11-4:14. Finally, as Stoner and Winand were leaving the building, Stoner told Bostic to let Wilhide know that he was "out" of jail. JA 102. Winand recorded the interaction.

Bostic "was a little shaken up." JA 102. She composed herself and then called the chief of police to inform him that "Chad Stoner had just been in the office and stated what [she] felt was a threat that they should be aware of." JA 102. After reviewing surveillance footage of the incident, Detective Baker arrested Stoner for terroristic threats.

---

[1] In a later prison call, Winand and Stoner discussed how Stoner said Houston rather than Dallas, where the shooting of several police officers had actually occurred, and that Stoner meant that Conewago would be like Dallas, not that Dallas would be like Conewago.

In recorded phone calls from prison, Winand and Stoner discussed posting on the internet the recording of the interaction between Bostic and Stoner despite his lawyer's likely disapproval. In these discussions, Stoner remarked to Winand "once again you wonder why the people of Dallas did what they did." JA 216. Less than a week after Stoner's encounter with Bostic and his arrest, the video was posted on YouTube.

Around the same time, Stoner was the subject of a separate firearms investigation. In connection with that investigation, Trooper Earhart and Special Agent Leone searched Stoner's home, where they found a safe containing letters from Stoner to Winand and a list of names and addresses of local police officers and their families. In the letters, Stoner said that "we do need to kill more 'law enforcement['] or in other words 'domestic terrorist[s].'" JA 225; see JA 111. He expressed "hope" that "more people start killing cops again," JA 225, and referred to a quote he attributed to a founding father about replenishing the "tree of Liberty" with "the blood of . . . Tyrants and Patriots," JA 226. Expressing frustration with his incarceration, Stoner wrote that there are "people that are going to have hell to pay, when I do get out. I've decided that some of them have caused more [than] enough harm to myself and my family to justify a retaliation. What's even better is, I have a lot of time to plan." JA 234. Stoner's letters also directed Winand to purchase "as much of the 5.56 armor-piercing Raufoss rounds [as she could]" for his AR-15 rifle. JA 245. He referred to the ammunition as "the 'cop killers.'" JA 245.

The jury returned guilty verdicts on all counts.

C

4

At sentencing, the District Court adopted the Probation Office's Presentence Report ("PSR") calculations, which recommended a total offense level of 26 for each count and a criminal history category of VI, resulting in a sentencing range of 120-150 months.

Stoner objected to the application of Guideline enhancements for intent to carry out threats under U.S.S.G. § 2A6.1(b)(1), an official victim under U.S.S.G. § 3A1.2(b), and stolen firearms under U.S.S.G. § 2K2.1(b)(4). The District Court concluded that the trial record supported the six-level enhancements for both an intent to carry out threats and an official victim. At sentencing, the Court heard evidence in support of the stolen firearm enhancement. Leone testified about the investigation into Stoner's illegal possession of fourteen firearms, including an AR-15. Leone explained that Stoner stole firearms from the Hilton Brothers and later offered to sell them to another individual. The Hiltons identified the firearms based on unique characteristics. Leone also recounted a meeting with Donald Hamilton, who agreed to hold the AR-15 at Stoner's request when Stoner grew worried that law enforcement would come to his home. The Court concluded that this evidence supported the two-level stolen firearm enhancement. The Court then imposed a 150-month sentence.

Stoner appeals both the trial verdicts and his sentence.

## II[2]

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

A[3]

Stoner argues that there was insufficient evidence to support the jury verdicts finding him guilty of conspiring to and transmitting a threat in interstate commerce under § 875(c) and mailing threatening communications under § 876(c).

Under § 875(c), it is illegal to "transmit[] in interstate or foreign commerce any communication containing . . . any threat to injure the person of another."  Under § 876(c), it is illegal to "deposit[] [in any post office or unauthorized depository for mail matter] or cause[] to be delivered [by the Postal Service] . . . any threat to injure the person of the addressee or of another."  To prove a threat under these statutes, the Government must prove beyond a reasonable doubt that: (1) "the defendant transmitted a communication for the purpose of issuing a threat or with knowledge that the communication would be viewed as a threat," and (2) "the defendant transmitted a communication that a reasonable person would view as a threat." United States v. Elonis, 841 F.3d 589, 596 (3d Cir. 2016).[4]  The first element is subjective and requires proof of the defendant's purpose or knowledge. Id. at 596.  The second element is objective and

---

[3]  Stoner failed to move for acquittal before the District Court, and therefore, we review his sufficiency challenges for plain error. United States v. Wolfe, 245 F.3d 257, 260-61 (3d Cir. 2001).  This entails "review[ing] the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." Id. at 261.

[4] Because no party challenges applying Elonis to § 876(c), and two other circuit courts have done so, we will too. See, e.g., United States v. Mabie, 862 F.3d 624, 631 (7th Cir. 2017); United States v. Crawford, 665 F. App'x 539, 541 (7th Cir. 2016) (noting that the Supreme Court's holding in Elonis, reading a subjective mens rea requirement into § 875(c), "also applies to § 876(c)"); United States v. Twitty, 641 F. App'x 801, 802 n.1 (10th Cir. 2016).

"requires the jury to consider the context and circumstances in which a communication was made to determine whether a reasonable person would consider the communication to be a serious expression of an intent to inflict bodily injury on an individual."[5] Id. at 597.

The jury convicted Stoner of making threats in both the YouTube video of his encounter with Bostic and the letters he sent to Winand. We address the sufficiency of the evidence to support these convictions below.

1

Posting the YouTube video documenting Stoner's interaction with Bostic at the township building is sufficient to support a conviction for conspiracy to transmit a threat and transmitting a threat in interstate commerce under § 875(c). The content of the video satisfies the subjective element. First, Stoner directly referenced violence targeting police officers in Texas, likening Conewago Township to Texas, in connection with his displeasure with Willhide. By saying that if Willhide "continues to act in the way that she is" and alluding to a desire for a police massacre in Conewago, Stoner demonstrated an awareness of a violent event and a desire to convey a threat to commit similar violence. Recording at Township Building at 4:00-4:14. Referencing a highly sensitive subject matter in a threat, such as a mass shooting of police officers, "make[s] it impossible to believe [Stoner] was unaware it would be interpreted as a threat." Elonis,

_____

[5] For the reasons described herein, the video Stoner and Winand posted on YouTube and the letters Stoner sent Winand from prison contained threats that constitute criminal conduct not protected by the First Amendment. See Elonis, 841 F.3d at 597.

841 F.3d at 600. Second, Bostic's decision to call the police and Stoner's subsequent arrest for terroristic threats placed Stoner on notice that others viewed his conduct as threatening, and thus he had "knowledge that the communication" and contents of the YouTube video "would be viewed as a threat." Id. at 596; id. at 598-99 (holding that the fact that the defendant's ex-wife sought a restraining order against him due to prior violent Facebook posts established that he had the requisite knowledge and thus subjective intent under § 875(c) when he made subsequent violent Facebook posts). Third, Stoner and Winand decided to post the video, even though Stoner expected that his attorney would not approve. In other words, "[b]y the time he made [his YouTube post], he was clearly aware of how his audience would understand it." Id. at 600.

The contents of the video are also objectively threatening. A reasonable person seeing how Stoner was dressed, wearing a large knife and gun holster strapped to his leg, together with his reference to the Texas police shooting if Willhide "continues to act in the way that she is," and hearing his statement that Bostic should tell Wilhide that Stoner was "out" of jail,[6] were facts that would cause a reasonable person to feel threatened. Recording at Township Building at 4:00-4:14. Bostic said she felt "shaken" by the interaction and called the police. JA 102. For these reasons, a reasonable person would view the video of the incident as containing a threat.

2

---

[6] "The language of § 875(c) does not require that the threat be made directly to the intended target; it simply prohibits 'any threat to injure the person of another' made in interstate commerce." United States v. Morales, 272 F.3d 284, 288 (5th Cir. 2001).

Stoner's letters are sufficient to support convictions for mailing threatening communications under § 876(c). The letters demonstrate both Stoner's subjective intent to make a threat and knowledge that his communications would be received as threats. Stoner was incarcerated on charges of terroristic threats at the time he sent the letters, and thus, as with the YouTube video, he was aware that his statements about shooting law enforcement incited fear and prompted action against him.

In addition, a reasonable person would find the letters threatening given the context and circumstances. In these letters, Stoner explicitly stated that more police officers, whom he called domestic terrorists, needed to be killed, and expressed "hope" that "more people start killing cops again." JA 225. He wrote that there are "people that are going to have hell to pay, when I do get out[,]" and that he had "time to plan" his "retaliation." JA 234. Stoner also directed Winand to purchase "cop killer[]" ammunition, asking her to get "as much of the 5.56 armor-piercing Raufoss rounds that [she could]." JA 121, 245. These letters were found in a safe in his home alongside a list of local police officers and their family members. This information, in totality, would instill fear in a reasonable person, and a reasonable person would believe that Stoner had a specific plan to carry out violent conduct.

Because there was overwhelming evidence to support Stoner's convictions for conspiring to and making threats under both §§ 876(c) and 875(c), there is no error, plain or otherwise, in allowing the convictions to stand.

B[7]

Stoner argues that the District Court improperly applied three sentencing enhancements based on the intent to carry out a threat, an official victim, and unlawful possession of stolen firearms. We address each enhancement in turn.

1

The Guidelines provide for a six-level sentencing enhancement where the offense of conviction "involved any conduct evidencing an intent to carry out [a] threat." U.S.S.G. § 2A6.1(b)(1). In assessing this enhancement, courts can consider conduct that occurred both during the offense and before the offense that is "substantially and directly connected to the offense." Id. at application n.1.

The trial evidence showed that Stoner had an intent to carry out the threats made in the YouTube video and in his letters. He possessed an AR-15, he told Winand that he would have time in jail to plan how would retaliate against those who had hurt him, he directed Winand to purchase as much "cop killer[]" ammunition as she could, JA 245, and he had prepared a list of local police officers and their family members. Thus, the District Court had sufficient evidence to impose the six-level enhancement under § 2A6.1(b).

2

---

[7] We "exercise plenary review over a district court's interpretation of the Guidelines," but "factual findings relevant to the Guidelines" are reviewed for clear error. United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc). "A finding is clearly erroneous when[,] although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. (alteration in original) (internal quotation marks and citation omitted).

The District Court also had sufficient evidence to impose a separate six-level sentencing enhancement under U.S.S.G. § 3A1.2(b). This enhancement applies where the offense victim was a government officer or employee, the offender's conduct "was motivated by such status," and the offense was an offense against the person. U.S.S.G. § 3A1.2 & application n.3.

Stoner's threats were targeted at township officials and police officers and their families. Stoner made the threatening comments contained in the YouTube video while speaking with the township manager at the township building about the township supervisor and alleged corruption between the township supervisor and local police. His letters expressed his desire to "kill more 'law enforcement,'" and his hope that people "start killing cops again." JA 225. His statements in phone calls with and letters to Winand show that his threats against these individuals were motivated by their status as law enforcement or government officials.

Stoner's claim that his threats were born out of policy disagreement rather than motivated by official status is irrelevant. Stoner disagreed with Wilhide and the police for actions they took in their official capacities, or as he put it, for their "clear and present prejudicial attacks" against him, Recording at Township Building at 2:58-3:44, and inactions they took as police officers and township officials.[8] Thus, the District Court did not err in applying the six-level enhancement under § 3A1.2.

---

[8] Stoner's assertion that the enhancement does not apply because he had personal disputes with the Township officials is unavailing. Application note 3 to U.S.S.G. § 3A1.2 excludes, for example, personal disputes where "the defendant and victim were

The record also supports the two-level stolen firearm enhancement under U.S.S.G. § 2K2.1(b)(4).  At sentencing, Special Agent Leone testified that Stoner stole firearms, including the AR-15, from the Hilton Brothers, who identified the firearms based on their unique characteristics.  According to the PSR, Stoner specifically asked a friend to keep the AR-15 for him because he anticipated that law enforcement would be searching his home.  Thus, the evidence supported the stolen firearm enhancement.

In sum, the District Court did not clearly err in applying these three Guidelines enhancements.

III

For the foregoing reasons, we will affirm.

---

employed by the same government agency."  Stoner was not employed by a government agency.