*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CF-344

DARRYL MALLOY, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 6/21/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court of the
District of Columbia
(CF3-10085-15)

(Hon. Anita M. Josey-Herring, Trial Judge)

(Argued November 16, 2017                    Decided June 21, 2018)

*Matthew B. Kaplan* for appellant.

*Sumit Mallick*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Lindsey Merikas*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

Dissenting opinion by *Associate Judge* MCLEESE, at page 39.

FERREN, *Senior Judge*:    After a jury trial, appellant Darryl Malloy was

acquitted of several gun charges but convicted of a felony threat.[1]  On appeal, he argues for reversal on three grounds:

1.  The trial court abused its discretion by admitting in evidence testimony about an uncharged prior threat by Malloy against complainant Anthony Johnson.

2.  The trial court also abused its discretion in (a) precluding admission of certain out-of-court statements made by Malloy and Johnson during the charged incident, and (b) limiting the jury's consideration of other such statements that were admitted in evidence.

3.  The trial court plainly erred in omitting the *mens rea* element of the felony threats offense when instructing the jury.

We affirm as to the first two grounds but reverse Malloy's conviction for instructional error and remand the case for further proceedings.

---

[1]  D.C. Code § 22-1810 (2001) provides:

> Whoever threatens within the District of Columbia to kidnap any person or to injure the person of another or physically damage the property of any person or of another person, in whole or in part, shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned not more than 20 years, or both.

## I.      Facts and Proceedings

According to the government's evidence, during the evening on July 22, 2015, Johnson was visiting his son, Anthony Tate, and his son's mother, Shaunette Tate, in the 2700 block of Bruce Place Southeast, also known as Woodland Terrace.  At around 7:50 p.m., after sitting for awhile on the patio outside the Tate home, Johnson walked across the patio to his car close by in a parking lot, in order to make a call from his phone that was charging there.  While Johnson was sitting in his car, Malloy approached him, calling him "hot" (meaning a snitch), accusing him of always calling the police, and asking whether Johnson was then on the phone with the police.  When Shaunette Tate saw Malloy and Johnson arguing, she called Anthony Tate to "come outside" where the altercation was occurring.

After hearing his mother, Anthony Tate approached Johnson and Malloy, who continued to call Johnson "hot."  Malloy then asked Johnson, "What if I shoot your car?" to which Johnson replied, "[W]ell, I guess that make you feel good," whereupon Malloy asked, "What if I shoot you?" to which Johnson responded, "I guess I be dead."  Malloy then pulled out a black pistol from his waistband and pointed it at Johnson.

Anthony Tate intervened, pushing Malloy's arm in an effort to get the firearm out of Johnson's face. Johnson then got into his car and drove away, stopping down the block next to a marked police car where Sergeant Ellen Bader was sitting. Johnson described the incident to Sergeant Bader and identified Malloy as the man who had threatened him, referring to Malloy by his nickname "Pop Pop." At trial, Sergeant Bader described Johnson as "really upset" and "agitated."

During the testimony of Johnson and the two Tates, the government elicited evidence of a prior instance in which Malloy had threatened Johnson.[2] Shaunette Tate testified that a couple of weeks before the July 22, 2015, incident, she observed Malloy yelling across the parking lot at Johnson, calling him "hot." During that confrontation, she added, Malloy told Johnson that "he'd shoot [Johnson's] car up." Johnson also testified for the government, confirming that he and Malloy had had prior confrontations in which Malloy had "said threatening words" to him.

---

[2] Before trial, the government filed a motion to introduce in evidence two prior incidents of Malloy threatening Johnson, relying on *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964) and (*William*) *Johnson v. United States*, 683 A.2d 1087 (D.C. 1996) (en banc). The trial court allowed admission of one of the prior incidents, concluding that it satisfied two of the three exceptions specified in *Johnson* permitting evidence of an accused's "other crimes."

Finally, during Anthony Tate's testimony, the prosecutor played for the jury a recording of a telephone call from the D.C. Jail in which Malloy was on the phone with a friend. During the call, Malloy's friend went to find Anthony Tate so that Malloy could speak with him. After Tate was handed the phone, Malloy told Tate that he was to go to his father (Johnson) and tell him not to come to court because Tate and Tate's mother still have to live around there. At the end of the call, Malloy advised Tate: "[T]ell your father I still live right there. Me and my mom still live there. You know how that shit go." Malloy then said, "That's not a threat" before hanging up.

During the defense case-in-chief, Malloy called two eyewitnesses to testify about the incident. Damon Hudson, a friend of Malloy, testified that he and Malloy had been playing basketball with a group of friends during the afternoon and early evening hours of July 22, 2015, near the parking lot where Johnson was sitting in his car on the phone. Hudson further testified that as he, Malloy, and the others were walking back to the apartment complex, they ran into Johnson, who had his cell phone out. Malloy asked why Johnson was taking pictures of him, and the two began to argue. During the argument, according to Hudson, he heard Johnson tell Malloy to go get his gun, at which point Malloy told Johnson he did not have a gun, lifting his shirt to show Johnson that no gun was in his waistband.

Johnson then sped off in his car. During the altercation, Hudson did not see Shaunette Tate or Anthony Tate in or near the parking lot.

Charles Malloy, appellant Malloy's brother, also testified for the defense, informing the jury that he had been with his brother before he got into an argument and saw part of the argument with Johnson. Charles Malloy added that when he approached his brother and Johnson in the parking lot, Charles Malloy saw Johnson pulling off in his car saying, "Have your gun when I get back."

At the close of the evidence, the trial court instructed the jury on the elements of each crime, using the standard "Redbook" instructions at the time.[3]

Approximately four hours after jury deliberations began, the jury sent the trial court a note: "[W]e have reached an impasse on Count 3." While the parties were reviewing that note, the clerk gave the trial court a second note in which the jurors inquired: "May we consider the audio phone call as a threat of Count 3?" As both the government and defense counsel agreed, the court told the jurors that

---

[3] For the felony threats instruction, the trial court used CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.12 *Threats to do Bodily Harm* (4th ed.) (current version at CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.130 (B) *Threats* (5th ed. Rev. 2017)).

"the answer to that question is no" and that they should "continue their deliberations."

After returning to deliberations, the jury found Malloy guilty of threatening to injure or kidnap a person, but acquitted him of assault with a dangerous weapon,[4] possession of a firearm during a crime of violence,[5] and carrying a pistol without a license outside a home or place of business.[6] Thereafter, the court sentenced him to twenty-four months of incarceration. Malloy then filed this timely notice of appeal.

## II. *Johnson* Evidence

Malloy challenges the trial court's decision to admit evidence that he previously threatened Johnson. Specifically, he opposes the admission of testimony regarding the altercation that occurred a few weeks before the charged conduct, when Malloy threatened to shoot Johnson's car. During trial, the government argued — and the trial court agreed — that evidence of Malloy's prior

---

[4] D.C. Code § 22-402 (2001).

[5] D.C. Code § 22-4504 (b) (2001).

[6] D.C. Code § 22-4504 (a).

threat was relevant and admissible under our en banc decision in *Johnson*,[7] for two reasons: the threat was "direct and substantial proof of the crime charged," and it was "necessary to place [the] incident in context." The trial court also concluded that this evidence was more probative than prejudicial.

Malloy contends, to the contrary, that the prior threat was inadmissible "propensity" evidence and, in any event, was more prejudicial than probative. He fails to persuade us.

We review for abuse of discretion.[8] We have held that "evidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged."[9] This "disposition" or "propensity" limitation does not preclude admission of "other crimes" evidence "when relevant to factors such as motive, intent, or the identity of the person

---

[7] See *supra* note 2.

[8] (*Thomas*) *Jones v. United States*, 127 A.3d 1173, 1185 (D.C. 2015) (citing *Busey v. United States*, 747 A.2d 1153, 1165 (D.C. 2000)).

[9] *Legette v. United States*, 69 A.3d 373, 379 (D.C. 2013) (quoting *Drew*, 331 F.2d at 89).

charged with the commission of the crime on trial."[10]   In addition, as we announced in *Johnson*, other crimes evidence is not barred when it "(1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context."[11]   On the other hand, even when an "other crimes" exception would otherwise apply, the trial court must exclude the evidence "if its probative value is substantially outweighed by the danger of unfair prejudice it poses."[12]

As we have noted, Malloy insists that the prior threat was forbidden propensity evidence, not subject — as the trial court ruled — to *Johnson* exceptions (1) and (3).  We need not resolve whether Malloy's prior threat was admissible under exception (1) as "direct and substantial proof of the charged crime."[13]  We are satisfied that the threat was admissible under exception (3) as

---

[10]   *United States v. Morton*, 50 A.3d 476, 482 (D.C. 2012) (quoting *Drew*, 331 F.2d at 90) (internal quotation marks omitted).

[11]   (*William*) *Johnson*, 683 A.2d at 1098; *accord Williams v. United States*, 106 A.3d 1063, 1067 (D.C. 2015).

[12]   (*William*) *Johnson*, 683 A.2d at 1101.

[13]   *Id.* at 1098.

"necessary to place the charged crime in an understandable context."[14]

This court derived exception (3) from earlier decisions sustaining admission of other crimes evidence offered "to explain the immediate circumstances surrounding the offense charged,"[15] that is, evidence derived from "events so closely related to the charged offense in time and place that [it is] necessary to complete the story of the crime . . . by placing it in context of nearby and nearly contemporaneous happenings."[16]

Evidence of Malloy's suspicions of Johnson as a police informant and of their contentious relationship "was relevant to determining whether the defendant's words charged as threats would have conveyed a fear of serious bodily harm to an ordinary hearer" in Johnson's situation (the test applicable at the time of trial).[17] Furthermore, testimony about the prior altercation, reflecting the men's preexisting hostility to each other, was admissible to show that Malloy's suspicion of Johnson

---

[14] *Id.*

[15] *Id.* (quoting (*Edward*) *Green v. United States*, 440 A.2d 1005, 1007 (D.C. 1982) ("evidence necessary to 'complete the story'")).

[16] *Id.* (quoting (*Kelvin*) *Holmes v. United States*, 580 A.2d 1259, 1266 (D.C. 1990)) (alterations in original) (other citations omitted).

[17] *Williams*, 106 A.3d at 1068.

as a police informant had been building.[18] In sum, such evidence was properly admitted as context evidence, "necessary to complete the story."[19]

While we conclude that the evidence was properly admitted under the third *Johnson* exception, we noted earlier that another requirement also "applies to the admission of all evidence of 'other crimes,' *Drew* and non-*Drew* alike[.] . . . [R]elevance, or probative value, must be weighed against the danger of unfair prejudice."[20] In making that determination, "the trial court should consider a variety of factors, including the need for the evidence, the efficacy of alternative

---

[18] *Compare Hughes v. United States*, 150 A.3d 289, 302-03 (D.C. 2016) (evidence of other sexual assault charges properly admitted for context because "the charges concerning each of the women were not clearly explainable to the jury without evidence of the other"), *and Williams*, 106 A.3d at 1068 (evidence properly admitted to provide context for hostile relationship between appellant and victim), *and Muschette v. United States*, 936 A.2d 791, 798 (D.C. 2007) (evidence of appellant's prior threats against victim properly admitted as context evidence because "[w]ithout that testimony, the murder would have appeared as an isolated incident that occurred at a random location amongst strangers"), *with Gray v. United States*, 147 A.3d 791, 800 (D.C. 2016) (evidence of earlier robbery improperly admitted because ample context could have been provided by other, more simple means), *and Bryant v. United States*, 148 A.3d 689, 699 (D.C. 2016) (evidence of other murders erroneously admitted to show context for establishing gang-related motive where prior murders were "merely cumulative of other testimony describing the rivalry or feud").

[19] *Williams*, 106 A.3d at 1067 (citations omitted).

[20] *Sanders v. United States*, 809 A.2d 584, 590-91 (D.C. 2002) (quoting *Busey*, 747 A.2d at 1165).

proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility."[21]   This evaluation is "quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision."[22]

We defer here, satisfied that the trial court did not erroneously exercise its discretion in weighing probative value against unfair prejudice.  As we have observed, the prior threats testimony placed the charged threat and assault in context, helping the jury to understand Johnson's casual, virtually indifferent response to Malloy's threat when no weapon had yet been displayed.  Malloy fails to identify any substantial reason why the prior threat was unduly prejudicial other than the risk that the jury would impermissibly conclude that, because Malloy had threatened Johnson in the past, he must have threatened him this time as well.  The "context" exception, however, defeats that generic objection here.[23]

---

[21]   *Morton*, 50 A.3d at 482 (citations and internal quotation marks omitted).

[22]   (*Christopher*) *Holmes v. United States*, 143 A.3d 60, 63 (D.C. 2016) (quoting (*William*) *Johnson*, 683 A.2d at 1095).

[23]   *Compare Muschette*, 936 A.2d at 798 (probative value outweighed danger of unfair prejudice as the testimony regarding prior bad acts was necessary to prove "the government's case by negating [appellant's] claim of self-defense," placing the shooting in context, and providing the jury with a broader perspective of appellant's relationship with the victim), *and* (*Woodrow*) *Wilson v. United*

(continued…)

### III. Hearsay Evidence

Malloy contends that the trial court abused its discretion when ruling on the admissibility of testimony by two defense witnesses expressing what Malloy and Johnson had said to one another during their altercation. He stresses that, in excluding or limiting certain reported statements of the two antagonists as hearsay, the trial court erred, to his substantial prejudice. Again, we cannot agree.

At issue are the testimonies of Malloy's friend, Damon Hudson, and Malloy's brother, Charles Malloy. Defense counsel offered the testimony of each "to show what was said," not for the truth of the matter asserted. Without referencing the witnesses' names, counsel explained to the court:

> I expect my witness to say that the argument escalated.

---

(…continued)
*States*, 690 A.2d 468, 470 (D.C. 1997) ("But the risk of *unfair* prejudice to [appellant] from the threats was minimal, while the probative value of the evidence was exceptionally high," and appellant "was not entitled to have the threats evidence singled out for any special protection or instruction") (emphasis in original) (internal citation omitted), *with Gray*, 147 A.3d at 800-01 (concluding that probative value of earlier robbery of different victim was substantially outweighed by danger of prejudice, as details of earlier robbery strongly suggested criminal propensity rather than admissible identity or context evidence), *and Sanders*, 809 A.2d at 591 (concluding that admission of videotape showing appellant with handgun was more prejudicial than probative where unimpeached oral testimony that defendant possessed such handgun was admissible and less inflammatory).

> There was name calling. [1] Mr. Johnson threatened to beat Mr. Malloy's tail end, among other things. [2] There was, at some point, Mr. Johnson talking about, you know, "How are you going to do that? With a gun?" [3] I think my witness is going to say that Mr. Malloy pulled his shirt up and said, "I don't need a gun to kick your" derriere, or maybe a little stronger wording than that, and that [4] at some point Mr. Johnson left and said, "I will be back. Get your gun."

Defense counsel never attempted to elicit the first two statements (nor did either witness volunteer them). Thus, only the third and fourth statements are before us.[24] As to these, rather than exclude them altogether as hearsay as the government requested, the trial court admitted them in evidence with a limiting instruction, informing the jury that the statements by the observers of the Johnson-Malloy altercation "don't come in for the truth of the matter asserted. They come in to explain the state of mind of the witness [Hudson or Charles Malloy] at the time all of these events were occurring."

This court has recognized that, when appropriate, the state-of-mind

---

[24] Hudson made both the third and fourth statements, testifying that he had heard Johnson tell Malloy "go get your gun," at which point Malloy "is like 'I don't got no gun; I don't need no gun for you' and lifted up his shirt" to show Johnson that no gun was in his waistband. Charles Malloy also offered the fourth statement. He saw Johnson pulling off in his car saying, "Have your gun when I get back."

exception to the hearsay rule can apply to the mind of a listener as well as a declarant.[25] But it is difficult to understand how the states of mind of Hudson and Charles Malloy would be relevant at trial.[26] At issue, rather, were the states of mind of the declarants, Johnson and Malloy, expressing their mutual antagonism — to the end of discerning whether Malloy was engaged in a taunt or a threat. Thus, the question here is whether the trial court abused its discretion[27] by imposing its "witness's" state-of-mind limitation on the jury's consideration of the

---

[25] *See Evans-Reid v. District of Columbia*, 930 A.2d 930, 944 (D.C. 2007) (The state-of-mind exception "permits the use of hearsay statements for the limited purpose of showing the state of mind of the declarant, or of the listener, including motive.") (internal citations omitted); *In re C.D.*, 437 A.2d 171, 175 (D.C. 1981) ("A statement by one individual to another is admissible to show the state of mind of the listener."); *Clark v. United States*, 412 A.2d 21, 29 (D.C. 1980) (state-of mind exception "permits the introduction of a person's out-of-court declarations of future intent to perform an act, to show that the act was actually performed").

[26] The state of mind of neither defense witness, Damon Hudson nor Charles Malloy, was at issue here. *See Blackson v. United States*, 979 A.2d 1, 10 (D.C. 2009) ("Because neither the passenger's [(listener)] nor McGee's [(declarant)] states of mind were at issue in this case, the trial court did not abuse its discretion in finding that the statements did not fit the state of mind hearsay exception."); *see also* (*Damion*) *Jones v. United States*, 17 A.3d 628, 632 (D.C. 2011) (state-of-mind exception permits admission of hearsay statements to show "the state of mind of the declarant if the declarant's state of mind is at issue in the trial") (internal quotation marks omitted).

[27] *See Dutch v. United States*, 997 A.2d 685, 689 (D.C. 2010) ("We review a trial court's decision to admit hearsay evidence for abuse of discretion; however, the determination of whether a statement falls under an exception to the hearsay rule is a legal conclusion, which we review *de novo*.") (citing *Brown v. United States*, 840 A.2d 82, 88 (D.C. 2004)).

witnesses' statements.

On appeal, Malloy contends that the testimonies of Damon Hudson and Charles Malloy were not hearsay at all. These statements, Malloy stresses, had not been offered in evidence to prove their truth but, rather, "to show the context and nature of the [defense] argument and, specifically, of the statements made by Malloy" — "evidence that was directly relevant to the determination of whether [Malloy][28] made a true threat."[29]

Malloy's argument, however, is undercut by the fact that the statements he sought to admit were in fact admitted. More specifically, the trial court did not exclude the testimonies of Hudson and Charles Malloy, and we can discern no

---

[28] In his brief, Malloy inadvertently typed "Johnson."

[29] Malloy relies on pronouncements by this court for support. He contends that "[s]tatements that are not offered at trial to prove the truth of the matter asserted are not hearsay." (*Damion*) *Jones*, 17 A.3d at 632. Accordingly, he asserts, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." *Jenkins v. United States*, 80 A.3d 978, 989 n.12 (D.C. 2013) (quoting Fed. R. Evid. 801 advisory committee note); *see also Cox v. United States*, 898 A.2d 376, 380-81 (D.C. 2006) (finding harmless error in trial court's ruling that statement was inadmissible hearsay, where appellant sought admission of statement not for its truth but for the fact that appellant had told police officers when arrested about going to shooting range and leaving gun innocently in car).

residual prejudice from the reference in the trial court's instruction limiting the jury's consideration of their testimonies to each witness's "state of mind." The instruction was provided only once, early on,[30] and similar additional statements of the two witnesses were admitted after the instruction without further elaboration of it.[31] In sum, we perceive no substantial prejudice — no abuse of discretion. Any instructional error was harmless;[32] it "was sufficiently insignificant to give us fair assurance that the judgment was not substantially swayed by it."[33]

---

[30] During direct examination, Hudson testified that Malloy had asked Johnson, before the argument began, "Why was you taking my picture?" The trial court then provided the limiting instruction.

[31] Hudson testified, without a cautionary instruction, that Johnson had told Malloy, "Go get your gun. Go get your gun," to which Malloy had replied, "'I don't got no gun; I don't need no gun for you' and lifted up his shirt." Charles Malloy confirmed the "get your gun" statement that Johnson allegedly made. Upon objection before Charles Malloy testified about the statement, the trial court said: "State of mind exception. You may go ahead" — without elucidating further.

[32] *See Gardner v. United States*, 140 A.3d 1172, 1183 (D.C. 2016) (noting that where error is found, the question whether trial court discretion has been abused turns on whether the "non-constitutional error was harmless[] [under] the standard set forth in *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)") (brackets omitted).

[33] *Foreman v. United States*, 114 A.3d 631, 640 (D.C. 2015) (emphasis and citation omitted)*; see Hinton v. United States*, 979 A.2d 663, 691 (D.C. 2009) (en banc) ("If the error had a 'substantial influence' on the outcome, or if we are 'left in grave doubt' as to whether it did, 'the conviction cannot stand.'") (citing *Kotteakos*, 328 U.S. at 765).

## IV. Plain Error Review

In Malloy's final challenge, he maintains that his felony threats conviction must be reversed because, in light of this court's en banc decision in *Carrell*,[34] the jury instructions unconstitutionally permitted the jurors to find him guilty without finding an essential element of the offense: that he "acted with the purpose to threaten or with knowledge that his words would be perceived as a threat."[35]

At the close of the evidence, the trial court instructed the jury (in the part relevant here) as follows:

> As to the charge of threatening to kidnap or injure a person, the elements of threat, each of which the government must prove beyond a reasonable doubt, are [1] that the defendant spoke words heard by Anthony Johnson; [2] the words the defendant spoke would cause a person reasonably to believe that Anthony Johnson would be seriously harmed; and [3] that the defendant intended to make the communications which constituted the threat. The government is not required to prove that the defendant intended to carry out the threat. It is not necessary that . . . the intended victim actually heard the

---

[34] *Carrell II v. United States*, 165 A.3d 314 (D.C. 2017) (en banc).

[35] *Id.* at 324 (citing *Elonis v. United States*, 135 S. Ct. 2001, 2012 (2015)). In *Elonis,* the Supreme Court declined to decide whether "recklessness," in addition to "knowledge" or "purpose," would satisfy the essential *mens rea*. 135 S. Ct. at 2013. We also decline that opportunity.

words or learned about them.

Rather than include *Carrell*'s language applicable to a defendant's intent, this instruction permitted conviction merely if the words spoken would cause a person "reasonably to believe" that the complainant would be seriously harmed, without regard to whether the defendant intended such a threat or knew that the words would be perceived as a threat. Malloy neither brought this omission to the court's attention nor objected to the instruction.

Malloy's failure to object at trial[36] means that his claim of error "is subject to the strictures of 'plain error' review."[37] "For reversal, there must be [1] 'error' that is [2] 'plain' (meaning 'clear' or 'obvious'), that [3] 'affects substantial rights,' and

---

[36] In Malloy's supplemental brief, he asserts that his "motion for a judgment of acquittal should be deemed to preserve all sufficiency arguments and his conviction should be reversed in accordance with the reasoning adopted in *Carrell*," *i.e.*, evaluated and reversed under the *Chapman v. California*, 386 U.S. 18 (1967) (harmless beyond a reasonable doubt). However, we need not address the issue inherent in that argument: whether a motion for judgment of acquittal ("MJOA") in a jury trial, premised on a specific claim of error, is sufficient to preserve an appellant's challenge to the sufficiency of the evidence as to all elements of a crime. *See Newby v. United States*, 797 A.2d 1233, 1238 n.2 (D.C. 2002) ("[T]he rules in this area might benefit from rethinking, but we leave that endeavor to another day."). We also need not decide whether Malloy's second (general) MJOA, not pinned to a particular alleged error, transformed his first (specific) MJOA into a general one for purposes of preserving a sufficiency claim for our review, as Malloy has failed to challenge the sufficiency of the evidence on appeal.

[37] *Muir v. District of Columbia*, 129 A.3d 265, 273 (D.C. 2016).

that, if not corrected, [4] would result in a 'miscarriage of justice' (meaning conviction of an innocent defendant) or otherwise would 'seriously affect [ ] the fairness, integrity or public reputation of judicial proceedings.'"[38]  Ultimately, in conducting this review, "[w]e have said reversal for plain error should be confined to particularly egregious situations," as "plain error is meant to strike a careful balance between judicial efficiency and the redress of injustice."[39]  We turn to each of the criteria required for review.

### A.    Was there error?

To satisfy plain error review, there first must be a finding of trial court error, a "[d]eviation from a legal rule."[40]  At the time of Malloy's trial, the felony threats statute required findings "that the defendant uttered the words to another person; that the words were of such a nature as to convey fear of serious bodily harm or injury to the ordinary hearer; [and] that the defendant intended to utter the words

---

[38]    *Wooden v. United States*, 6 A.3d 833, 834 n.5 (D.C. 2010) (quoting *United States v. Olano*, 507 U.S. 725, 732-36 (1993) and (*Wesley*) *Wilson v. United States*, 785 A.2d 321, 326 (D.C. 2001)) (brackets in original).

[39]    *In re Taylor*, 73 A.3d 85, 95 (D.C. 2013) (alterations and internal quotation marks omitted).

[40]    *Buskey v. United States*, 148 A.3d 1193, 1205 (D.C. 2016) (quoting *Olano*, 507 U.S. at 732-33).

which constitute the threat."[41] Shortly after Malloy's trial, this court sitting en banc in the *Carrell* litigation,[42] reviewed a preserved challenge to the trial court's failure to consider an appellant's state of mind before convicting him of attempted threats. Drawing upon a Supreme Court decision,[43] we held that a defendant's *mens rea*, or state of mind, is a necessary element of the crime.[44] We concluded, more specifically, that in order to obtain a threats conviction, either misdemeanor or felony, the government must prove the defendant's intent to utter the communication as a threat, and it "may carry its burden of proof by establishing that the defendant acted with the purpose to threaten or with knowledge that his words would be perceived as a threat."[45] In light of our en banc decision in *Carrell*, the government quite properly concedes that the trial court erred in failing to instruct the jury on the requisite *mens rea* of felony threats.

---

[41] *Carrell I v. United States*, 80 A.3d 163, 171 (D.C. 2013) (quoting *Campbell v. United States*, 450 A.2d 428, 431 n.5 (D.C. 1982)), *reh'g en banc granted, opinion vacated*, No. 12-CM-523, 2015 WL 5725539 (D.C. June 15, 2015), and *on reh'g en banc*, *Carrell II*, 165 A.3d 314.

[42] *See generally Carrell II*, 165 A.3d 314.

[43] *Elonis*, 135 S. Ct. 2001.

[44] *Carrell II*, 165 A.3d at 323-24.

[45] *Id.* at 325.

### B.     *Was the error plain?*

Having discerned error, we turn to whether that error was "plain." First, "plain is synonymous with clear or, equivalently, obvious,"[46] not "subject to reasonable dispute"[47] — as now "established and settled"[48] by *Carrell* for the statutory threat at issue here. Second, plainness is assessed as of "the time of appellate review" regardless of "the state of the law at the time of trial."[49] Accordingly, because the law applied at trial did not require a *mens rea* finding for conviction, and thus was "clearly at odds"[50] with the law established by *Carrell*, the instructional error was assuredly plain, a conclusion the government does not dispute.

---

[46]  *Jackson v. United States*, 157 A.3d 1259, 1268 (D.C. 2017) (quoting *Olano*, 507 U.S. at 734) (brackets and internal quotation marks omitted).

[47]  *Wills v. United States*, 147 A.3d 761, 772 (D.C. 2016).

[48]  *Wheeler v. United States*, 930 A.2d 232, 245 (D.C. 2007) (plain error "requires a determination of whether the claimed error was clearly at odds with established and settled law").

[49]  *Wills*, 147 A.3d at 772 (citing *Muir*, 129 A.3d at 267 and *In re Taylor*, 73 A.3d at 99); *see Little v. United States*, 989 A.2d 1096, 1102 (D.C. 2010) ("This is so even where the defendant is tried before the change in law that gives rise to his appellate claim.") (citing *Thomas v. United States*, 914 A.2d 1, 5-6 (D.C. 2006)).

[50]  *Wheeler*, 930 A.2d at 245.

## C.    Did the error affect appellant's substantial rights?

**1.**

Our inquiry turns to whether the erroneous instruction — the court's omission of the requisite *mens rea* for felony threats — affected Malloy's substantial rights. To have done so, the error must have had a "substantial and injurious effect or influence in determining the verdict";[51] it must have been "of such a character that viewed in the context of the trial, there [was] a reasonable probability that but for the error the factfinder would have had a reasonable doubt respecting guilt."[52]    Thus, in "determining whether there is a reasonable probability, [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

---

[51] *Mozee v. United States*, 963 A.2d 151, 160 (D.C. 2009) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)) (alterations omitted).

[52] *Muir*, 129 A.3d at 274-75 (internal quotation marks omitted); *accord Perry v. United States*, 36 A.3d 799, 819 (D.C. 2011) (when an element of the offense has been omitted from the jury instructions, "the question is whether it is 'reasonably probable (and not merely possible) that the jury would have harbored a reasonable doubt' about appellant['s] guilt if it had been properly instructed on the *mens rea* element") (quoting *Heath v. United States*, 26 A.3d 266, 280 (D.C. 2011)).

confidence . . . in the outcome."[53]

In sum, we will reverse "only in an extreme situation in which the defendant's substantial rights [are] so clearly prejudiced that the very fairness and integrity of the trial [is] jeopardized"[54] — essentially the application of *Kotteakos* non-constitutional error.[55]  But while on occasion we have called this burden "formidable,"[56] we are well aware that "[t]he reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different."[57]

---

[53]  *Perry*, 36 A.3d at 819 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

[54]  *Comford v. United States*, 947 A.2d 1181, 1189 (D.C. 2008).

[55]  *See Perez v. United States*, 968 A.2d 39, 93 (D.C. 2009) ("The measure is, similar to the *Kotteakos* formulation in requiring the showing of a reasonable probability that, but for the error claimed, the result of the proceeding would have been different.") (quoting *Dominguez Benitez*, 542 U.S. at 81-82) (brackets and internal quotation marks omitted).

[56]  *Comford*, 947 A.2d at 1189; *see also Griffin v. United States*, 144 A.3d 34, 37 (D.C. 2016); *Lowery v. United States*, 3 A.3d 1169, 1173 (D.C. 2010).

[57]  *Thomas*, 914 A.2d at 21 n.27 (quoting *Dominguez Benitez*, 542 U.S. at 83).

**2.**

We focus, next, on the alleged threats. While certainly inappropriate and disturbing, they were not inherently threats in the traditional sense. The words that allegedly constituted threats were questions: "What if I shoot your car?" "What if I shoot you?"[58] The usual threat is in the form of a direct statement.[59] However, in

---

[58] At trial, the government also alleged as a threat Malloy's statement that he would "whup Mr. Johnson's ass." It is unclear from the record, as well as from the parties' briefs, whether the government's indictment was based on this statement as well as on the two "shoot" statements. In the event that the government did proceed under the "whup" statement, we note that the evidence supporting it was underwhelming. During Johnson's testimony, the government inquired whether Malloy had said anything else to Johnson "about what he might want to do." When Johnson was unable to recall Malloy's statements, the government impeached him with a prior statement he had made to police officers and later had adopted in the grand jury. In that prior statement, Johnson reported that Malloy "was talking about he was going to whoop my ass." When confronted with this statement at trial, however, Johnson explained, "I think I recall I think that's not what happened." But later in Johnson's trial testimony, he explained that he had told Malloy "you don't weigh a buck five, you're not going to whoop my ass," because Malloy had said "he . . . [was] going to whoop my ass, I'm like I didn't do anything to you for you to threaten me." Conversely, Shaunette Tate testified that after Malloy called Johnson a name, she believes Johnson responded by telling Malloy, "[y]ou only weigh a buck fifty; I'll kick your ass." Anthony Tate testified that he could not remember hearing either Malloy or Johnson saying "I'll kick your ass."

[59] *See*, *e.g.*, *Carrell II*, 165 A.3d at 317 (evidence supported conviction for threats where appellant was choking victim with both hands and yelling, "I could fucking kill you, I could kill you, I could kill you right now if I wanted to"); (*Richard*) *Jones v. United States*, 124 A.3d 127, 131 (D.C. 2015) (appellant found guilty of attempted threats where appellant told the victim "I'm going to smack the

(continued…)

light of the prior threats evidence attributable to the tumultuous relationship between Malloy and Johnson, the jury might well have found that Malloy intended his questions as threats. On the other hand, if expressly instructed that, for conviction, the jury must find that Malloy had intended his questions as threats, or knew that Johnson would have perceived them that way, the jury might have found differently; it might have determined that Malloy had meant his words merely as taunts, or believed that Johnson would have understood them as such.

The answer to whether Malloy intended his questions as threats, or believed Johnson would perceive them as such, becomes even more elusive when considering Johnson's reaction to those questions. During their altercation, in response to Malloy's arguably threatening questions, Johnson appeared unperturbed.[60] His casual responses could have been taken as significant evidence that Malloy reasonably believed Johnson was not taking him seriously. Accordingly, we cannot say how a properly instructed jury would have interpreted Malloy's questions: hyperbole or threats? Under the erroneous instruction that

---

(…continued)
shit out of you").

[60] Malloy inquired of Johnson, "What if I shoot your car?" to which Johnson responded, "[W]ell, I guess that make you feel good." Malloy then asked "What if I shoot you?" to which Johnson replied, "I guess I be dead."

was given, however, it was enough for conviction (absent *Carrell*'s *mens rea* requirement) if the jury merely found that Malloy had uttered words to Johnson that an "ordinary hearer"[61] — not necessarily Johnson — would have reasonably believed would lead to serious harm.

**3.**

We have observed, nonetheless, that in some circumstances, "[a]n instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."[62] The government relies on three judicial decisions to convince us that this case, too — without the required *mens rea* instruction — presents "overwhelming and uncontroverted evidence that [Malloy] intended, or at the least

---

[61] See *supra* note 41 and accompanying text.

[62] (*Bruce*) *Green v. United States*, 948 A.2d 554, 559, 561 (D.C. 2008) (substantial rights not affected where government's evidence was overwhelming and no rational jury could have found that appellant touched daughters in a way consistent with jury instruction on second-degree child sexual abuse without also finding requisite intent); *see Downing v. United States*, 929 A.2d 848, 863-64 (D.C. 2007) (no prejudice despite erroneous aiding and abetting instruction because "no reasonable juror could have concluded that [the appellant] had any intent other than to kill," where appellant suggested the killing, assisted in transporting victim to scene of the murder, helped remove victim from the car, and stood with the person who ultimately shot victim).

knew, that his words would be perceived as threats." The government's reliance on these decisions, however, overstates the evidence in this case.

In *Atkinson v. United States*,[63] a stalking prosecution, we discerned no reversible error in the trial court's failure to instruct the jury that an element of the crime was whether the victim's fear was reasonable.[64] Finding the erroneous omission harmless beyond a reasonable doubt, we explained that "the jury was presented with substantial — almost overwhelming — evidence of appellant's objectively frightening behavior," where appellant repeatedly contacted the victim, showed up uninvited at both the victim's and her parents' residences, attempted to gain access to the victim's new apartment building, and was aware that a Civil Protection Order had been issued against him.[65]

---

[63] 121 A.3d 780 (D.C. 2015).

[64] *Id.* at 787.

[65] *Id.* at 787-88 ("Appellant was aware that the CPO was in place and that he should have known that his prior conduct toward [the victim] would cause her to fear for her safety, feel seriously alarmed, or frightened, or suffer emotional distress as a result.").

Similarly, in *Elonis v. United States*,[66] on remand from the Supreme Court, the Third Circuit affirmed appellant's conviction of making threatening communications, as the court concluded that the instructional error omitting the *mens rea* element was harmless beyond a reasonable doubt.[67] In finding that the record contained "overwhelming evidence" that appellant knew the threatening nature of his communications, the court highlighted that appellant had posted a number of messages on Facebook that referenced raping and killing his ex-wife and continued to post violent messages even after attending a court proceeding at which his ex-wife sought a restraining order against him based on her fear of the posts.[68]

Also, in *Wilson-Bey v. United States*,[69] we considered an erroneous instruction that understated the requisite *mens rea* of the crime charged against two

---

[66] 841 F.3d 589 (3d Cir. 2016).

[67] *Id.* at 598.

[68] *Id.* at 598-99 ("Considering the graphic nature of the three messages [appellant] posted in October, it is not at all credible that [appellant] did not know his ex-wife would interpret them as threats. But it is less credible still that, having attended the court proceeding at which she sought a restraining order against him, [appellant] remained unaware of his ex-wife's fears as he posted more violent messages on November 7 and 15.").

[69] 903 A.2d 818 (D.C. 2006) (en banc).

appellants.[70]  As to one, we reversed the conviction of premeditated murder while armed because "taking the evidence as a whole, an impartial juror might readily have a reasonable doubt" as to whether she had formed an intent to kill rather than "join with others in beating up [the victim] and her friends."[71]  Conversely, as to the other appellant, we affirmed her conviction of first-degree murder, despite the erroneous jury instruction, because there was "overwhelming" evidence of the required *mens rea*.[72]  Having learned that her co-appellant had been "jumped" by the victim, the second appellant — "obviously the leader of the group that went to [the victim's] home to avenge the beating" — grabbed a knife, told the others who were present that she was "going to kill that bitch," and then stabbed the victim.[73]

Unlike the foregoing cases, the evidence that Malloy's mindset was criminally threating is far from "overwhelming and uncontroverted."  We acknowledge that evidence of record was sufficient to find that Malloy had the requisite intent, but the question we must answer is not whether the evidence was

---

[70] *Id.* at 844-47.

[71] *Id.* at 845.

[72] *Id.* at 845-47.

[73] *Id.* at 845-46.

sufficient but "whether there is a 'reasonable probability' that the jury's verdict would have been swayed by the erroneous instruction."[74]

The answer is informed by the fact that evidence of Malloy's guilt was not "overwhelming and uncontroverted" (as the government would have it) when compared with the cases cited by the government and others.[75] The trial court had informed the jurors, in response to their note, that they could not consider Malloy's jail call to Anthony Tate "as a threat of count 3"; thus, the government's case rested on the testimony of three witnesses, all of whom were related to each other

---

[74] *Perry*, 36 A.3d at 819-21 (prejudice from instructional error where the jury deadlocked in two separate trials and convicted appellants only as aiders and abettors after reinstruction that it could convict without finding the requisite *mens rea* to inflict serious bodily injury).

[75] *See, e.g.*, *Atkinson*, 121 A.3d at 787-88; *Elonis*, 841 F.3d at 598-99; *Wilson-Bey*, 903 A.3d at 845-47; *Little*, 989 A.2d at 1102 (instruction held harmless because of overwhelming evidence in record that appellant acted with requisite mental state for each charge for which he was convicted, such that "there [was] no reasonable probability that the erroneous instruction affected the outcome"); (*Bruce*) *Green*, 948 A.2d at 561; *Kidd v. United States*, 940 A.2d 118, 128 (D.C. 2007) (no prejudice from instructional error where evidence was compelling and "reasonable jurors inferred from the facts and circumstances surrounding [the] murder that [appellant] had the requisite *mens rea*" based on appellant's possession of gun, act of pointing the gun at the victim's stomach, his anger towards the victim, and his flight immediately after the shooting) (citation and internal quotation marks omitted).

and impeached with inconsistent statements.[76] The government's witness accounts also differed markedly from those of the defense witnesses,[77] making the outcome of this case ultimately a credibility contest. This is far from uncontroverted evidence.

---

[76] During Johnson's testimony, he was impeached with a statement he made to the police, and later adopted in the grand jury. On direct examination, the government asked whether Malloy had made any other statements to Johnson about actions he would take. Johnson denied being able to recall any additional statements Malloy made to him. The government subsequently confronted Johnson with his prior statement in which he reported that Malloy "was talking about he was going to whoop my ass." On direct examination, Johnson explained "I think that's not what happened." Shaunette Tate was also impeached with prior statements she made to the grand jury. During direct examination, the government inquired whether Malloy said "anything else about what he might shoot?" When Shaunette Tate responded he had not, the government confronted her with her grand jury transcript in which she testified Malloy said "Well, I'll shoot your head. I'll kill you. I'll shoot your car up." When impeached with this statement, Shaunette Tate recalled responding that she testified "maybe the shoot your car" part of the statements but that she had not testified about the part "about shooting your head." Rather, she advised "[t]he lady typed it wrong, because I didn't hear [Malloy] say that."

[77] During Hudson's testimony, he stated that neither Anthony nor Shaunette Tate was anywhere near Johnson or Malloy during the argument, while Charles Malloy also testified to not seeing Anthony Tate during the encounter. Shaunette and Anthony Tates' testimonies, on the other hand, were significantly different in that they testified they did not see anyone other than Malloy, Johnson, and each other during the encounter between Johnson and Malloy. There were additional significant differences in the testimony of government and defense witnesses. All government witnesses testified to observing Malloy brandish a weapon, while both defense witnesses explained that Malloy told Johnson he did not have a weapon and lifted his shirt to show there was not a weapon in his waistband.

It is "impossible for judges to divine with certainty the jury's subjective thinking; our appellate responsibility is to determine whether there is a reasonable probability that a 'rational jury' improperly relied on an erroneous instruction to convict."[78]  Thus, "our task is to make sense of the jury's verdict in light of the evidence presented and the instructions given to the jury, and, where available, the jury's expressions of its questions about the evidence or the law."[79]  "Inferences can then be drawn about the likely impact of the erroneous instruction."[80]

Of the four counts on which Malloy was indicted, he was acquitted on all except felony threats (Count 3).  The jury's acquittal on three of the four counts tells us that the jury had difficulty reconciling the evidence with guilt.  Notably, as to Count 3, there were jury questions about the evidence and the law.[81]  Twice the jurors told the court of their difficulty in determining whether the government had proved the elements of felony threats.  Approximately four and a half hours into deliberations, the jury submitted two notes to the trial court.  In the first, the jury advised that it had "reached an impasse on Count 3."  While the parties were

---

[78] *Perry*, 36 A.3d at 821.

[79] *Id.*

[80] *Id.*

[81] *See id.*

conferring about the first note, the jury submitted a second note, inquiring whether the recorded jail phone call, rather than Malloy's provocative "shoot" questions, could be considered a threat for purposes of finding Malloy guilty of Count 3. Thus, the only insight we have into the jury's thinking is its difficulty in reaching a verdict on felony threats with the elements as instructed. Limited by these notes and the trial record, we must conclude that this is a case in which "our confidence in the outcome of the trial is necessarily undermined."[82]

This is not to say that no reasonable jury could have found Malloy guilty if properly instructed. But that is not our standard of review. Applying the proper standard, we conclude it is reasonably probable that the jury — already struggling with whether to find Malloy guilty of felony threats without having to find an intent to threaten — "would have harbored a reasonable doubt about [Malloy's] guilt if it had been properly instructed on the *mens rea* element."[83] Malloy has therefore cleared the third hurdle of plain error review.

---

[82] *Id.*

[83] *Id.* at 819 (citing *Heath,* 26 A.3d at 280) (internal quotation marks omitted).

### D. *Did the error seriously affect the fairness, integrity or public reputation of judicial proceedings?*

We now must "decide whether to exercise our discretion to correct [the instructional] error by reversing appellant's conviction" given the fourth criterion of plain error review.[84] "Whether we exercise that discretion is contingent on our determination either that the error in question resulted in a miscarriage of justice, that is, the conviction of someone actually innocent; or that it seriously affected the fairness, integrity or public reputation of judicial proceedings."[85] "Put simply, this is a prejudice-to-the-court inquiry, the object of which is to determine whether this court can affirm the conviction without compromising its goal of delivering justice or diminishing itself in the eyes of the public."[86]

We have held that an instruction which "omit[s] the *mens rea* element of the offense charged" is of "constitutional dimension."[87] And we have confirmed that a

---

[84] *Wheeler*, 930 A.2d at 248.

[85] *In re Taylor*, 73 A.3d at 103 (alterations, brackets, and internal quotation marks omitted).

[86] *Id.*

[87] *Wilson-Bey*, 903 A.2d at 822, 844-45 (applying *Chapman* standard (harmless beyond a reasonable doubt) to preserved instructional error where jury instructions eliminated *mens rea* element from jury's consideration as to whether

(continued…)

constitutional error of a magnitude which "goes to the essence of the crime[]

charged, seriously affects the fairness and integrity of the proceedings."[88]  In

(*Joyce*) *Johnson v. United States*,[89] the Supreme Court concluded nonetheless that

an erroneous instruction — omitting the "materiality" required for conviction of a

false statement in a perjury trial — did not satisfy the fourth criterion, but only

because the evidence supporting materiality was "overwhelming," and materiality

was "uncontroverted" both at trial and on appeal.[90]  This court, too, has declined to

---

(…continued)
appellants intended to aid and abet the principal in killing the victim or simply had the intent to join others in assaulting the victim); *see Neder v. United States*, 527 U.S. 1, 15 (1999) (applying *Chapman* standard of review to appeal in which trial court's instructions to the jury omitted an element of the offense).

[88] *Perry*, 36 A.3d at 821-22 (internal quotation marks omitted) (integrity of judicial proceedings compromised where "evidence about appellants' participation in the kicking assault [of the victim] was controverted by the testimony of two defense witnesses" and appellants presented a credible argument that they may have been wrongly convicted "without a jury determination that they had the *mens rea*" under an aiding and abetting theory); *see also Vaughn v. United States*, 93 A.3d 1237, 1270 (D.C. 2014) ("[Appellant] was wrongly convicted of aggravated assault on an aiding and abetting theory of liability, without a jury determination that [he] had the *mens rea* required for conviction of that offense, and such [a] wrongful conviction necessarily affects the integrity of this proceeding and impugns the public reputation of judicial proceedings in general.") (quoting *Perry*, 36 A.3d at 822) (brackets in original) (internal quotation marks omitted).

[89] 520 U.S. 461 (1997).

[90] *Id.* at 470 (no credible argument that appellant's false statement made under oath for which she was convicted — "lying about the source of the tens of thousands of dollars she used to improve her home — was somehow not material
(continued…)

reverse under the fourth criterion for plain error review on occasions when the trial court erroneously omitted language from a standard instruction.[91] We are confident, however, that none of our previous fourth-criterion decisions would support affirmance here.[92]

In this case, the government's threat evidence was controverted in both

_____

(…continued)

to the grand jury investigation" into her boyfriend's alleged cocaine and marijuana trafficking operation).

[91] *See Williamson v. United States*, 993 A.2d 599, 604 (D.C. 2010) (declining to find the third and fourth plain error criteria satisfied where there was compelling evidence of a grudge between appellant and the victim; appellant likely provided murder weapon to his accomplice; appellant drove his accomplice to and from the murder scene; and appellant was the only person with a motive to kill victim); *Kidd*, 940 A.2d at 128-29 (fourth plain error criterion not satisfied even if appellant's rights had been substantially affected, because appellant "had a fair opportunity to present his case to the jury," "[r]easonable jurors could conclude that the testimony of the eyewitness siblings was credible and reliable," and appellant had a motive to participate in the killing); *Bates v. United States*, 834 A.2d 85, 95 (D.C. 2003) (no miscarriage of justice in failing to reverse for erroneous jury instruction as "no reasonable juror would find that the appellant did not deliberate before he killed" the victim, as evidenced by appellant's running "106 feet" to where the victim had fallen to the ground before final shots were fired); *see also* (*Joyce*) *Johnson*, *supra* notes 89-90, 520 U.S. at 469-70; (*Bruce*) *Green*, *supra* note 62, 948 A.2d at 561; *White v. United States*, 613 A.2d 869, 870-71 (D.C. 1992) (en banc) (declining to reverse for alleged *per se* plain error where jury instruction failed to include provision that, for conviction of "intermediate" level of forgery, the jury must find that each check in question — all of which were in evidence — was valued at $250 or more).

[92] See *supra* note 91.

forums, trial and appellate; the jury expressed its difficulty in evaluating the evidence of the charged threats; and, as a further caution in this case, Malloy was acquitted on the remaining, related charges. Accordingly, in the circumstances reflected in the present proceeding, "where an essential element of the offense is . . . contested and has not been found by the jury, [a] wrongful conviction necessarily affects the integrity of this proceeding and impugns the public reputation of judicial proceedings in general."[93] There is no question that such an omission, as in this case, seriously undermines the fairness and integrity of judicial proceedings.[94]

## V.     Conclusion

We affirm as to Malloy's first two claims of error, perceiving no abuse of trial court discretion in admitting Malloy's uncharged prior threat in evidence, and in limiting the admission of out-of-court statements by two defense witnesses. However, as to Malloy's claimed instructional error in omitting an essential element of the offense, we conclude that he has satisfied all four criteria for plain

---

[93] *Perry*, 36 A.3d at 822 (quoting *Perez*, 968 A.2d at 96) (internal quotation marks omitted).

[94] *See*, *e.g.*, *Vaughn*, *supra* note 88, 93 A.3d at 1270; *Perry*, *supra* note 88, 36 A.3d at 822.

error. We therefore reverse his conviction of felony threats and remand the case for further proceedings consistent with this opinion.

*So ordered.*

MCLEESE, *Associate Judge*, dissenting: For essentially the reasons stated by the court, *ante* at 7-17, I agree that Mr. Malloy's first two arguments do not warrant reversal. I respectfully dissent, however, from the court's conclusion, *ante* at 23-38, that the trial court committed reversible error by not sua sponte instructing the jury that the offense of threats requires proof that the defendant intended or knew that his or her words would be taken as a threat.

I agree that the jury was not correctly instructed as to the elements of threats and that that error is now plain in light of this court's decision in *Carrell v. United States*, 165 A.3d 314 (D.C. 2017) (en banc). My reasoning diverges from that of the court on the third part of the plain-error test: whether Mr. Malloy carried his burden to show that "there is a reasonable probability that but for the error the factfinder would have had a reasonable doubt respecting guilt." *Muir v. United States*, 129 A.3d 265, 275 (D.C. 2016). In analyzing that question, we must take into account the jury's finding that Mr. Malloy's references to shooting Mr. Johnson and Mr. Johnson's car were objectively threatening. *Cf., e.g., Pope v.*

*Illinois*, 481 U.S. 497, 503 n.6 (1987) (in determining whether erroneous instruction as to element of offense was harmless error, Court considers whether "the facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same"). In other words, the question is whether there is a reasonable probability that the jury would have found that although Mr. Malloy's words were objectively threatening, Mr. Malloy did not intend or know that his words would be so understood. Such a reasonable probability could exist in some circumstances. For example, there could be evidence that the defendant's words, though objectively threatening, were intended as a joke. Or there could be evidence that the defendant had intellectual limitations. In the present case, however, I see no particular reason why the jury would have doubted that Mr. Malloy understood the threatening character of his references to shooting Mr. Johnson and Mr. Johnson's car.

In holding to the contrary, the court places substantial emphasis on the overall strength of the United States's case, even on issues that the jury resolved against Mr. Malloy. *Ante* at 31-34. In my view, that is not the correct inquiry. Although the United States's case as a whole was not overwhelming, the jury found beyond a reasonable doubt that Mr. Malloy's words were objectively

threatening. Our task on plain-error review is to determine whether, given that finding, there is a reasonable probability that the jury would nevertheless have found that Mr. Malloy did not intend or know that his words would be so understood. As the court acknowledges, we have described a defendant's burden on plain-error review as "formidable," and we have held that reversal under the plain-error standard is appropriate "only in an extreme situation in which the defendant's substantial rights are so clearly prejudiced that the very fairness and integrity of the trial is jeopardized." *Ante* at 24 (brackets and internal quotation marks omitted). I do not believe that Mr. Malloy has made such a showing. I therefore respectfully dissent.