**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 19-1254, 19-2770
_____

UNITED STATES OF AMERICA

v.

C.S.,

Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-18-cr-00376-001)
District Judge: Honorable Malachy E. Mannion
_____

Argued April 14, 2020
_____

Before: AMBRO, JORDAN, and SHWARTZ, <u>Circuit Judges</u>.

(Filed: May 15, 2020)
_____

Kim D. Daniel [ARGUED]
Office of United States Attorney

Middle District of Pennsylvania
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

      Counsel for Appellee

Quin M. Sorenson [ARGUED]
Office of Federal Public Defender
100 Chestnut Street
Suite 306
Harrisburg, PA 17101

      Counsel for Appellant

_____

OPINION
_____

SHWARTZ, <u>Circuit Judge</u>.

      C.S., a seventeen-year old, was adjudicated delinquent as a result of threats he made in an Internet chatroom dedicated to discussing terroristic attacks, in violation of 18 U.S.C. § 875(c). During several conversations, C.S. made threats against a local church. Although juvenile proceedings are usually sealed, the District Court permitted the Government to notify the church that it was the subject of a threat and that the party who communicated the threat had been prosecuted. The order did not identify C.S.

C.S. appeals the judgment and the notification order, arguing that the District Court: (1) erred in finding that his statements qualified as threats under § 875(c), and (2) violated the confidentiality provisions of the Juvenile and Delinquency Prevention Act of 1974 ("JDA"), Pub. L. No. 93-415, 88 Stat. 1109 (codified as amended in relevant part at 18 U.S.C. §§ 5031-5038), in allowing the Government to notify the church of the threats. Because the evidence proved that C.S. made threats that violated § 875(c) and the District Court acted well within its discretion in issuing the notification order, we will affirm.

I

A

C.S. participated in online group chats. One of those chats was dedicated to discussing the Islamic State. The Islamic State is a terrorist organization, often referred to as "ISIS," an acronym for the "Islamic State in Iraq and Syria." App. 135.

In the chatroom, C.S. used a screenname that evoked allegiance to Islamic fundamentalist guerrillas, and he shared a photo of himself wearing a headscarf and a headband of another terrorist organization, Hamas. He had conversations with, among others, "Zubair," who lived outside Pennsylvania. App. 137. C.S. and Zubair discussed obtaining ISIS weaponry and conducting ISIS-inspired attacks. One of their conversations proceeded as follows:

> Zubair:  are you planning an attack in the future
> Zubair:  or willing to

3

> C.S.: I'll be willing to I don't have any plans
> Zubair: I need help for one I'm planning
> C.S.: Ah
> C.S.: Ok
> . . .
> C.S.: Anyways
>    I'm going to bed soon
>    So can we discuss the help
> Zubair: DC[1]
> C.S.: hmm
> Zubair: u calling cops now Lol
> C.S.: No
> C.S.: I don't have a reason to

App. 627-30.

Later, after exchanging pictures of themselves in Islamic fighter garb, Zubair sent a photo of the Washington Monument. App. 633. The conversation continued:

> C.S.: Washington
> Zubair: yes
> . . .
> Zubair: would that not be amazing
> . . .
> C.S.: It would be
> . . .
> C.S.: Ok going to try to reflect on how ISIS did on
>    Paris
>    They did damage yes
>    But there were a lot

---

[1] "DC" refers to Washington, DC.

4

> Washington definitely has more security and agencies that have military grade weapons that will respond quick
> I'll recommend maybe a group of 6
> With bomb or weapon
> Maybe both

> . . .

> C.S.: Yes the Washington memorial sounds like a great target

> . . .

> Zubair: Is [the White House] to far away to shoot at [from the top of the Washington Monument]?
> C.S.: Mmm
> Perhaps not
> If the bullet isn't too heavy it should
> Be shootable

App. 634-42.

The two then discussed the appropriate weapons and their experience with them. The conversation thereafter turned to a discussion of churches in their respective areas:

> Zubair: disgusting they brainwash children
> C.S.: It's very big
> And tomorrow there will [be] a bunch of Christians
> Yes
> The Church has a daycare center too
> They are blind

App. 649-50.

The conversation continued about various targets:

5

C.S.: I brought a gun to [school] but I [didn't] pull it
        out
Zubair: yea
        good because we can do bigger things
C.S.: yes
. . .
        Or Wait for a riot in Harrisburg
. . .
        Or if Christians trigger me then I go at the
        church
. . .
        Too bad the Military and agencies deploy and
        are plentiful in DC
        Deploy quickly
Zubair: we can go inside [the Washington Monument]
C.S.: Yea
        And snipe from the top
. . .
Zubair: we should meet sometime
        the few mujahideen here should stick together
C.S.: Yes
        May allah guide us
. . .
Zubair: would you help me attack america under the
        caliphate flag
C.S.: Yes
. . .
Zubair: we should meet somewhere near DC and plan
        it
C.S.: Yes
        We should recruit very many
. . .

> Zubair:  we will kill many crusaders
> C.S.:  I hope
> . . .
> C.S.:  I'm going to a arts and craft store and I'll try
>         to buy
>         pipes, latches and model rocket engines

App. 655-71.

The next day, the two returned to their discussion about targeting Christians and a church:

> Zubair:  I'm thinking of throwing [a Molotov cocktail]
>         on someone's house
> C.S.:  That's what I want to do
> Zubair:  a catholic family
>         or lutheran
> C.S.:  The church [is nearby].
> . . .
>         I'll try not to get caught
>         Maybe I can sabotage their vans

App. 697-99.

In addition to the conversations with Zubair, C.S. made statements in the chatroom to a confidential informant that echoed his statements to Zubair.  When asked in the group chat if he lived close to Washington, C.S. replied that he lived close to Washington, Philadelphia, New York, and Harrisburg and that "there is a big ass church" near him.  App. 511.  The confidential informant asked C.S. if he would attack soon and what he wanted to target.  C.S. replied that he was "still preparing and gathering equipment" and "I haven't decided since I'm of similar distance from DC, NYC, and Philadelphia.

7

And slightly further Pittsburg [sic] . . . . And there is a church [is nearby] . . . . I need to choose carefully."  App. 383-85.

Law enforcement thereafter searched C.S.'s home and cell phone.  In his home, agents discovered assault rifles, ammunition, a crossbow, a headscarf, smoke bombs, grenade casings, military-style ammunition vest and gear, and a long-bladed knife.  His cell phone revealed Internet searches, literature about making explosives, Islamic Jihadi propaganda videos depicting beheadings, and photos of C.S. posing with his assault rifle while wearing military gear and head scarf.

B

The Government charged C.S. with making interstate threats in violation of 18 U.S.C. § 875(c) and filed a certification to proceed under the JDA because C.S. was under eighteen years old.[2]  The District Court held a delinquency hearing, where the Government presented the chatroom transcripts, the results of the searches, and C.S.'s post-arrest statements to law enforcement.  For his part, C.S. testified that

---

[2] Juvenile proceedings under the JDA differ from adult criminal proceedings.  Juveniles who are found to have committed a crime are deemed delinquent, rather than guilty. United States v. A.D., 28 F.3d 1353, 1355, 1358 (3d Cir. 1994). See generally United States v. Brian N., 900 F.2d 218, 220 (10th Cir. 1990) ("Under [the JDA], prosecution results in an adjudication of status—not a criminal conviction.").  In addition, juveniles are not entitled to indictment by a grand jury or a jury trial, but rather receive a bench trial.  See United States v. Doe, 627 F.2d 181, 182-83 (9th Cir. 1980) (collecting cases).

he made the statements to impress others in the chatrooms, to make friends, and to have others believe that he was serious about his statements, but that he never intended to carry out the attacks.

The District Court found C.S. delinquent. The Court held that, despite C.S.'s testimony about his underlying motivations, C.S. intended that his statements be taken as meaningful threats, so they qualified as threats under § 875(c). The Court also found that C.S. possessed equipment and materials that showed that he intended his statements to be taken seriously. After the hearing, the Court released C.S. to the custody of his mother and placed him on house arrest pending final disposition.

After the adjudication, the Government moved under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, to notify the church and the local police department of his threats and placement on house arrest. The Court held that the local police were not "crime victims" under the CVRA, but that the church was a "crime victim." App. 11. The Court, relying on our precedent in United States v. A.D., 28 F.3d 1353 (3d Cir. 1994), then observed that while the JDA provides that juvenile proceedings are generally confidential, it had the discretion to issue an order permitting the Government to notify the leader of the church that:

> a. a threat was made against the Church by a juvenile, who was arrested;
>
> b. the juvenile was adjudicated delinquent for communicating interstate threats against the Church;

9

c. the juvenile is currently under G.P.S. surveillance on house arrest; and

d. the juvenile's dispositional hearing will take place on a date yet to be determined.

App. 13-14. C.S. appealed that notification order, and, at his request, the Court stayed the notification pending appeal. The Court thereafter sentenced C.S. to time served and juvenile delinquent supervision until his twenty-first birthday. C.S. appealed the final disposition, and we consolidated the appeals.

II[3]

We have two tasks in this case: first, to examine the sufficiency of the evidence and, second, to evaluate whether the District Court had the discretion to lift the confidentiality that shields juvenile proceedings by permitting notification to the victim of the threats.

We consider "a sufficiency challenge de novo," and "review the record 'in the light most favorable to the

---

[3] The District Court had jurisdiction under 18 U.S.C. §§ 3231 and 5032. We have jurisdiction under 28 U.S.C. § 1291. When C.S. first appealed the District Court's notification order, the final judgment had not been entered, making the appeal interlocutory. There is now a final judgment, and because "interlocutory orders . . . merge with the final judgment in a case," we have jurisdiction to review the notification order. Verma v. 3001 Castor, Inc., 937 F.3d 221, 228 (3d Cir. 2019) (quoting Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008)).

prosecution to determine whether any rational trier of fact could have found proof of guilt[ ] beyond a reasonable doubt.'" United States v. Hendrickson, 949 F.3d 95, 97 n.2 (3d Cir. 2020) (alteration in original) (quoting United States v. Caraballo-Rodriguez, 726 F.3d 418, 430 (3d Cir. 2013) (en banc)). In reviewing a conviction or adjudication for violating § 875, we are mindful that "[w]hether a speaker's language constitutes a threat is a matter to be decided by the trier of fact," and the factfinder's decision is "entitled to great deference by this [C]ourt." United States v. Kosma, 951 F.2d 549, 555 (3d Cir. 1991).[4]

---

[4] Although C.S. suggests that we must decide "[w]hether a statement may qualify as a 'threat' as a matter of law" and conduct a plenary review of the record, Appellant's Br. at 16 n.5 (citing, e.g., United States v. Stock, 728 F.3d 287, 298 (3d Cir. 2013)), his arguments actually challenge whether the evidence satisfies the legal test for a threat. "[W]hether a communication constitutes a threat or a true threat 'is a matter to be decided by the trier of fact,'" that warrants deference. Stock, 728 F.3d at 298 (quoting Kosma, 951 F.2d at 555). In a rare case, it may be clear as a matter of law that a certain category of speech falls outside the statute's definition of "threat." See id. (citing Watts v. United States, 394 U.S. 705, 707-08 (1969), where "the Supreme Court held as a matter of law that the defendant's statement was merely 'political hyperbole' that did not fit within the definition of the phrase 'true threat'"). Because the threats here do not fall into such a category and the parties' arguments appropriately focused on the evidence and inferences that can be drawn from them, we apply the standard of review for sufficiency challenges and do not engage in plenary consideration of the record.

11

We review the District Court's notification order for abuse of discretion. United States v. Under Seal, 853 F.3d 706, 725 (4th Cir. 2017) (reviewing order disclosing juvenile records under the JDA for abuse of discretion); In re W.R. Huff Asset Mgmt. Co., LLC, 409 F.3d 555, 563 (2d Cir. 2005) (examining "a district court's determination under the CVRA . . . for abuse of discretion"); A.D., 28 F.3d at 1361 (holding that disclosure of juvenile records under the JDA is within the district court's discretion).

## III

### A

We first examine whether there is sufficient evidence to sustain the adjudication that C.S. violated § 875(c). Section 875(c) provides: "Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 875(c). "Section 875(c) contains both a subjective and objective component, and the Government must satisfy both in order to convict a defendant under the statute."[5]

---

[5] The threat need not be transmitted to the threatened individual. Rather, "in the age of social media . . . the recipient of the communication may be a defendant's Facebook followers or even the general public." United States v. Elonis (Elonis III), 841 F.3d 589, 597 n.7 (3d Cir. 2016). "For example, if a defendant transmits a communication on Facebook, he violates Section 875(c) if the communication is objectively threatening and the defendant transmitted it for the

United States v. Elonis (Elonis III), 841 F.3d 589, 596 (3d Cir. 2016).[6] The Government adduced sufficient evidence to prove both components.

1

To satisfy the objective component, the Government must "prove beyond a reasonable doubt that the defendant transmitted a communication that a reasonable person would view as a threat." Id. This "requires the [factfinder] to consider the context and circumstances in which a communication was made to determine whether a reasonable person would

purpose of issuing a threat or with knowledge that it would be viewed as a threat by his Facebook followers." Id.

[6] There are three Elonis cases. In the first case, our Court held that a § 875(c) conviction requires only that the Government prove the objective component. Elonis v. United States (Elonis I), 730 F.3d 321, 330-32 (3d Cir. 2013). The Supreme Court reversed and held that the Government must also prove a subjective component, that is, that the defendant communicated his statements with the purpose that they would be viewed as threats or knew that his statements would be viewed as threats. Elonis v. United States (Elonis II), 135 S. Ct. 2001, 2012 (2015). On remand from the Supreme Court, we explained that the Supreme Court's reversal focused only on the subjective component and acknowledged that § 875(c) has both an objective and subjective component. Elonis III, 841 F.3d at 596 & n.5. Thus, Elonis I's discussion of the objective component remains good law.

13

consider the communication to be a serious expression of an intent to inflict bodily injury on an individual."[7] Id. at 597.

C.S. argues that a reasonable person would not view his statements as threats because they were too speculative or conditional. This is not a basis to disturb the adjudication. There is no rule that conditional statements, statements "convey[ing] a vague timeline or condition," or even wishes can never be a true threat. Elonis v. United States (Elonis I), 730 F.3d 321, 334 (3d Cir. 2013); United States v. Stock, 728 F.3d 287, 301 (3d Cir. 2013); see also Kosma, 951 F.2d at 554 n.8 (stating even if the Court found the statements were "truly conditional," they would still be true threats). Rather, the focus is on whether the statements reflect, to a reasonable person, "a

---

[7] To avoid violating the First Amendment, threat statutes can only criminalize "true threats." Stock, 728 F.3d at 293-94 (citing Watts, 394 U.S. at 708). "[T]he plain meaning of a 'threat' under § 875(c) is distinct from the constitutional meaning of a 'true threat' under the First Amendment," as "'true threats' are a specific subset of 'threats.'" Id. at 294. Accordingly, there can be separate inquiries into whether a statement is a "threat" under § 875(c) or a "true threat" under the First Amendment. Id. C.S. argued to the District Court that his statements were neither "true threats" nor "threats." App. 209-13. Neither we nor the Supreme Court has explained all the differences between the two phrases. Stock, 728 F.3d at 293-94; see also Elonis II, 135 S. Ct. at 2014 (Alito, J., concurring in part and dissenting in part) ("This Court has not defined the meaning of the term 'threat' in § 875(c) . . . ."). We need not attempt to do so here because C.S.'s delinquency adjudication stands under both the case law governing "true threats" and that governing "threats."

14

serious expression of an intent to inflict bodily injury on an individual." Elonis III, 841 F.3d at 597.

A rational factfinder could find that a reasonable person could consider C.S.'s statements to be "a serious expression of an intent to inflict bodily injury." Id. For example, after stating that he had previously brought a gun to school but was waiting for a better occasion to engage in violence, C.S. stated: "Or if Christians trigger me then I go at the church." App. 655-56. This statement is similar to a statement the Elonis I Court found to objectively be a threat: "Try to enforce [a] [protective] Order . . . . And if worse comes to worse [sic] [/] I've got enough explosives to take care of the state police and the sheriff's department." Elonis I, 730 F.3d at 334. The Elonis I Court held that "taken as a whole, a jury could have found defendant was threatening to use explosives on officers who '[t]ry to enforce an Order' of protection that was granted to his wife." Id. Similarly, C.S. threatened to attack the church if "Christians trigger[ed]" him. App. 655-56. Thus, the conditional nature of his statements and absence of definite plans do not foreclose a finding by a rational factfinder that the statements were objectively threats.

Moreover, "the context and circumstances" in which C.S. made his statements about violence and terrorist attacks could allow a reasonable person to view them as serious. Elonis III, 841 F.3d at 597. C.S. possessed an extensive collection of weaponry, and he posted photos displaying those items to Zubair and other chatroom participants. Accordingly, a reasonable person could perceive C.S.'s statements about violence and terrorist attacks as serious because he had the

15

means to act on them.[8]  Put differently, a reasonable person could infer that the seriousness with which C.S. pursued and displayed his interest in violence and terrorism shows that C.S.'s statements on those subjects were not jokes, hyperbole, or throwaway remarks.  Therefore, given the context of the statements and the statements themselves, a rational factfinder could find that a reasonable person would view C.S.'s statements as a serious expression of an intent to inflict injury.[9]

2

"[T]o satisfy the subjective component of [§] 875(c), the Government must demonstrate beyond a reasonable doubt that the defendant transmitted a communication for the purpose of

---

[8] We have held that defendants' statements about using explosives or guns were threats even though there was no evidence that the defendants owned explosives or guns or knew how to use them.  Elonis I, 730 F.3d at 334; Kosma, 951 F.2d at 554.  Here, C.S. not only made statements about weapons, but the search of his house revealed that he had the means to do harm, reflecting that his statements show a "serious expression of an intent to inflict bodily injury," Elonis III, 841 F.3d at 597.

[9] As a final argument, C.S. argues that his statements could not be threats because he was merely agreeing with Zubair's threatening statements.  The text of the conversations, however, shows that C.S. was not simply engaged in polite active listening.  Rather, he both responded in agreement to threats by others and many of his statements reflected his own intentions.  App. 655-56 ("[I]f Christians trigger me then I go at the church[.]").

16

issuing a threat or with knowledge that the communication would be viewed as a threat." Elonis III, 841 F.3d at 596.

C.S. argues that the subjective component was not satisfied because he testified that he "had not intended to join any terrorist group or activity" and that he had participated in the conversations "because he enjoyed 'pretend[ing]' to be a 'radical' and wanted to earn 'respect' from other participants." Appellant's Br. at 22 (quoting App. 183-89, 194-97). Viewing all the evidence, however, a rational factfinder could conclude that C.S. had the requisite intent. For example, the evidence showed that he: (1) performed Internet searches on "mass shootings, bomb making, explosives, ISIS fighters, [and] videos depicting how to make terroristic items" around the same time as he was making the statements, App. 211; see, e.g., App. 206-07 (C.S.'s testimony regarding Internet research and knowledge of ISIS), 857-83 (catalogue of C.S.'s Internet searches and research); (2) was well-versed in the "ISIS vernacular" that was used in conjunction with terrorist acts and displayed that familiarity in the group chats, e.g. App. 655-71 (conversation between C.S. and Zubair using ISIS vernacular), and this "show[ed] a determined action to assimilate with those who use these words as a threat," App. 212; and (3) possessed "head scarves," e.g. App. 591 (evidence of C.S.'s possession of headscarf), and "ISIS insignias," App. 211. Together, this evidence was sufficient to prove that C.S. knew that his communications would be viewed as threats and that he wanted the listeners to view him as an ISIS-ready fighter.

C.S.'s argument that he lacked intent because he was pretending to be a warrior for respect or acceptance is irrelevant to the subjective inquiry. The Government must show that C.S. had "knowledge that the communication would

be viewed as a threat." Elonis III, 841 F.3d at 596. Thus, what matters here is whether C.S. knew the other chatroom participants would view his statements as threats, not the underlying reasons why he participated in the chat. Moreover, even if considered, C.S.'s motive revealed that he wanted the participants to believe he was serious about their shared interests, and thereby accept him. Thus, the evidence was sufficient to satisfy the subjective component, and the District Court's finding that it was proved must be upheld. See United States v. Hoffert, 949 F.3d 782, 790-91 (3d Cir. 2020) ("A jury's verdict must be upheld unless it falls below the threshold of 'bare rationality.'" (quoting Coleman v. Johnson, 566 U.S. 650, 656 (2012))); id. at 791 (rejecting defendant's sufficiency challenge based on the absence of witness testimony or direct evidence to find he had the requisite state of mind because his course of conduct provided sufficient evidence on the intent element).

Because the evidence supports the objective and subjective components required for a violation of § 875(c), we reject C.S.'s sufficiency challenge.

B

We next examine whether the District Court had the authority to enter an order permitting the Government to notify the church of the threat directed against it pursuant to the CVRA and whether the order was sufficiently tailored to protect C.S.'s identity. As we explained in A.D., 28 F.3d at 1355, the JDA gives district courts the discretion to disclose information concerning juvenile proceedings. Here, the District Court soundly exercised that discretion in entering the

18

notification order, and we are satisfied that the order more than adequately protects C.S.'s privacy.

1

The JDA governs proceedings involving persons who violate federal law before reaching their eighteenth birthday. 18 U.S.C. §§ 5031-5038; A.D., 28 F.3d at 1355. JDA proceedings are "closely analogous to criminal proceedings," but they "are not generally regarded as criminal proceedings." A.D., 28 F.3d at 1358. One core difference is that juvenile delinquency proceedings are usually confidential. Id. This is because the primary purpose of juvenile proceedings is rehabilitation, and "[p]ublic access . . . would embarrass and humiliate juveniles, make it difficult to obtain evidence about delicate matters, and adversely affect the rehabilitation of juveniles by publicly labelling them as criminals." Id. at 1361. To that end, the JDA "contains several confidentiality provisions." Id. at 1356. The key provision here is § 5038, which provides in relevant part:

> (a) Throughout and upon the completion of the juvenile delinquency proceeding, the records shall be safeguarded from disclosure to unauthorized persons. The records shall be released to the extent necessary to meet the following circumstances:
>
> > (1) inquiries received from another court of law;
> >
> > (2) inquiries from an agency preparing a presentence report for another court;

19

(3) inquiries from law enforcement agencies where the request for information is related to the investigation of a crime or a position within that agency;

(4) inquiries, in writing, from the director of a treatment agency or the director of a facility to which the juvenile has been committed by the court;

(5) inquiries from an agency considering the person for a position immediately and directly affecting the national security; and

(6) inquiries from any victim of such juvenile delinquency, or if the victim is deceased from the immediate family of such victim, related to the final disposition of such juvenile by the court in accordance with section 5037.

Unless otherwise authorized by this section, information about the juvenile record may not be released when the request for information is related to an application for employment, license, bonding, or any civil right or privilege. Responses to such inquiries shall not be different from responses made about persons who have never been involved in a delinquency proceeding.

. . .

> (e) Unless a juvenile who is taken into custody is prosecuted as an adult[,] neither the name nor picture of any juvenile shall be made public in connection with a juvenile delinquency proceeding.

§ 5038(a), (e).

In <u>A.D.</u>, we examined whether § 5038 barred press access to juvenile proceedings and records. 28 F.3d at 1355. We concluded that § 5038 does not mandate closure of all juvenile proceedings and sealing of juvenile records because the statutory text speaks of only preventing disclosure to "unauthorized persons."[10] <u>Id.</u> at 1359 (quoting § 5038(a)). Thus, the language contemplates that authorized persons may have access to juvenile records. We also explained that subsections (a)(1)-(6) mandate disclosure to certain individuals, stating that such persons "have a right to access the records of the judicial proceeding on request." <u>Id.</u> (citing § 5038(a)(1)-(6)) (emphasis omitted). We observed that only the last paragraph of § 5038(a) bars disclosure. Specifically, that paragraph states that "information about the juvenile record may not be released when the request for information is

---

[10] We also rejected the interpretation that the JDA barred all disclosure of records or access to proceedings because "an across-the-board ban on access to juvenile proceedings under the Act would pose a substantial constitutional issue" under the First Amendment. <u>A.D.</u>, 28 F.3d at 1358.

21

related to an application for employment, license, bonding, or any civil right or privilege." Id. at 1356 (citing § 5038(a)). Reading together § 5038(a)'s opening paragraph, its listed situations in (a)(1)-(6), and its final paragraph, we concluded that "§ 5038(a) implicitly recognizes that there are situations other than those described in paragraphs (a)(1) through (a)(6) and its concluding paragraph in which access could be authorized." Id. at 1359-60. Outside the disclosures mandated by (a)(1)-(6) and those barred by the concluding paragraph, release of records is within the district court's discretion, weighing "the interests of juveniles" and "objectives of the Act" against "the interests of the . . . public." Id. at 1361.[11]

A.D. did not consider the interaction between the JDA and the CVRA, as it was decided prior to the latter's enactment. Nor did A.D. identify every interest that would support disclosure or "all the factors to be weighted in determining whether access [to juvenile proceedings] is appropriate." Id. at 1361 n.7 (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 599 (1978)). Rather, we held that "the decision as to access is one best left to the sound discretion of the trial court." Id. Thus, although A.D. dealt with a press request for access to a juvenile proceeding and the associated First Amendment interests, it did not limit disclosure to situations involving constitutional or statutory interests. Instead, we left it to the district court's discretion to identify interests that support

---

[11] Other Courts of Appeals agree with our interpretation of § 5038. Under Seal, 853 F.3d at 727; United States v. Juvenile Male, 590 F.3d 924, 934 (9th Cir. 2010), vacated on other grounds, 564 U.S. 932 (2011) (per curiam); United States v. Eric B., 86 F.3d 869, 879 (9th Cir. 1996); United States v. Three Juveniles, 61 F.3d 86, 90-91 (1st Cir. 1995).

22

disclosure and to balance them against the juvenile's interest in confidentiality. Id. at 1360-61.

Because disclosure need not be explicitly authorized by a constitutional or statutory provision, the District Court could have cited a general interest in victim notification without reference to the CVRA. See Under Seal, 853 F.3d at 714, 727-28 (explaining that A.D.'s interpretation of the JDA recognized that "permissive disclosure authority . . . has the virtue of allowing district courts to accommodate disclosure requests in the event that the Constitution requires or at least arguably requires disclosure"). The victim's interest in being notified about the proceedings is a public interest that is proper to balance against the juvenile's interest in confidentiality and may warrant disclosure.

2

While a specific statutory or constitutional interest is not required to permit disclosure, here the notification was authorized under the CVRA. The CVRA "guarantees to the victims of federal crimes an array of substantive and participatory rights."[12] In re Rendon Galvis, 564 F.3d 170, 174 (2d Cir. 2009); see also § 3771(a). As relevant here, subsection (a) of the CVRA guarantees victims "[t]he right to be reasonably protected from the accused," "[t]he right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused," and "the right to be

---

[12] "The term 'crime victim' means a person directly and proximately harmed as a result of the commission of a Federal offense[.]" § 3771(e)(2)(A).

23

informed for the rights under this subsection." § 3771(a)(1), (2), (10). The CVRA: (1) obliges courts, "[i]n any court proceeding involving an offense against a crime victim," to "ensure that the crime victim is afforded the rights described in subsection (a)," § 3771(b)(1); and (2) requires the Government "make [its] best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a)," § 3771(c)(1). The rights are enforceable by motion of the crime victim or the Government. § 3771(d)(1), (3).

C.S. argues that notification was not permitted under subsection (a)(1) because it did not serve the "[t]he right to be reasonably protected from the accused." § 3771(a)(1). However, the church was one of the targets of C.S.'s threats, and the District Court concluded that it qualified as a "crime victim." App. 11. Thus, the Court reasonably found that notifying the church of C.S.'s threats and house arrest would serve its "right to be reasonably protected from the accused."[13] § 3771(a)(1).

C.S. asserts that the District Court did not view him as a danger. He relies on a statement the Court made in evaluating conditions of release or detention pending final disposition, in which it noted that, while C.S.'s statements constituted threats, "it was clear . . . that the defendant did not have the capability nor the intent to actually carry out those threats." App. 224. Subsection (a)(1), however, gives a crime victim the textually

---

[13] Indeed, as the proceedings have been under seal, it would be impossible for the church to avail itself of its right to inquire about C.S.'s final disposition under § 5038(a)(6) without notification by the Government.

broad right to reasonable protection from the accused. The District Court's ruling comported with that right.

C.S. also argues that his proceeding was not a "public court proceeding," so the notification order cannot serve as a "notice of any" such proceeding under subsection (a)(2). Appellant's Br. at 25. He is mistaken for several reasons.

First, whether and the degree to which a juvenile proceeding or its records are public are left to the discretion of the district court. A.D., 28 F.3d at 1359. When applying the CVRA here, the District Court here concluded that the records should be public to some degree, so a portion of this proceeding could qualify as a "public court proceeding." See United States v. L.M., 425 F. Supp. 2d 948, 954-55, 957 (N.D. Iowa 2006) (deciding a CVRA motion filed in a juvenile proceeding by first concluding, per A.D., that the records should be made public, then concluding that they fell within the CVRA).

Second, the text and structure of subsection (a)(2) indicate that crime victims have a right to notice of an accused's release even if the accused's proceedings were not "public court proceedings." The subsection begins with the subject phrase "[t]he right to reasonable, accurate, and timely notice" and is followed with two parallel prepositional phrases[14] separated by the disjunctive ("or"): (1) "of any public

---

[14] "A prepositional phrase is composed of '[a] preposition and its object and modifiers [and] may be used as a noun, an adjective, or an adverb.'" Am. Nat'l Fire Ins. Co. v. Rose Acre Farms, Inc., 107 F.3d 451, 455 n.2 (7th Cir. 1997) (quoting William A. Sabin, The Gregg Reference Manual 476

25

court proceeding, or any parole proceeding, involving the crime," and (2) "of any release or escape of the accused." § 3771(a)(2). When a subject is followed by two prepositional phrases, the phrases can each modify the subject. See Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 80 (1991) (holding that a statute permitting removal if the defendant is "[a]ny officer of the United States or [of] any agency thereof" "permits removal by anyone who is an 'officer' either 'of the United States' or of one of its agencies" (alterations in original) (quoting 28 U.S.C. § 1442(a)(1))). Accordingly, subsection (a)(2) provides for "notice" either "of any public court proceeding" or "of any release or escape of the accused." Indeed, it makes sense to provide a right to notification of release or escape untethered to a public court proceeding because the victim of a criminal-at-large convicted in a sealed proceeding is in equal danger as a victim of a criminal-at-large convicted in a pubic proceeding. See United States ex rel. Greenfield v. Medco Health Sols., Inc., 880 F.3d 89, 96 (3d Cir. 2018) (instructing that we avoid interpretations that create inconsistency with the statute's purpose). This interpretation of subsection (a)(2) demonstrates that the District Court properly granted the Government's CVRA motion because it furthered the church's "right to reasonable, accurate, and timely notice . . . of any release . . . of the accused." § 3771(a)(2).

3

Indeed, the JDA contemplates the disclosures at issue here. As stated previously, the JDA sets forth several

---

(7th ed. 1992)). "Of" is a preposition. "Of," Oxford English Dictionary (online ed. 2020).

circumstances in which juvenile records "shall be released to the extent necessary to meet" those circumstances. 18 U.S.C. § 5038(a). One circumstance is to respond to "inquiries from any victim of such juvenile delinquency, or if the victim is deceased from the immediate family member of such victim, related to the final disposition of such juvenile by the court in accordance with section 5037." § 5038(a)(6). This concept, receiving an inquiry from a victim, presupposes that the victim had notice of the crime. Notice to the victim, in other words, ensures that he can make the inquiries and receive the responses envisioned under subsection (a)(6).[15] The JDA itself contemplates notification to the victim, and thus supports disclosure.

4

C.S.'s argument that the notification order is overly broad also fails. C.S. asserts that the order could enable the church-leader to identify him and that the order does not restrict the leader's ability to disseminate the information he or she receives. C.S.'s first contention, that the order could allow the church-leader to identify him, fails because the District

---

[15] Some crimes may occur before a victim has knowledge of the offense, such as identity theft, in which a defendant commits a theft or deception using a person's identity and the person does not learn about the crime until sometime thereafter. The fact that the person is unaware of the crime at the moment that it is committed, however, does not make him any less entitled to information about the disposition of the case. Notice to that person would ensure that he could make the inquiries necessary to obtain that dispositional information.

27

Court directed that "the Government's notification shall not provide any information revealing [C.S.] as the source of the threats; this includes information that could allow someone to deduce that [C.S.] is the juvenile, such as identifying [where] the minor lives" in relation to the church. App. 12. Thus, the Court's instructions protect C.S. from identification.

We recognize the considerable importance of protecting the juvenile's identity, but here C.S.'s argument that the church-leader should not be able to share the information at all makes little sense because restricting how the leader can use the information would hamper his ability to protect the church, as that protection could include sharing the information with others. The order is also appropriately circumscribed because it (1) does not allow disclosure of C.S.'s name or photo, which § 5038(e) forbids; and (2) is more limited than the Government's request, as it did not permit disclosure to the local police, because, under the facts of this case, they were not "crime victims" entitled to notification. By focusing on the church-leader, the Court reasonably concluded that he was in the best position to determine what, if any, responses were necessitated by the information.

IV

For the foregoing reasons, we will affirm the judgment of delinquency and the notification order.

28